WOLFE, APPELLEE, *v.* WOLFE, APPELLANT.

[Cite as Wolfe v. Wolfe (1976), 46 Ohio St. 2d 399.]

(No. 75-26—Decided June 23, 1976.)

400

*Messrs. Addison & Smith, Mr. Richard C. Addison* and *Mr. L. Dennis Marlowe,* for appellee.

*Mr. George T. Gareff* and *Mr. Michael J. Norris,* for appellant.

WILLIAM B. BROWN, J. The basic issue presented—whether the Court of Common Pleas has power to modify the terms of a decree of divorce previously issued by it, which relate to an allowance of "alimony"—is a problem fraught with such infelicities that, in the opinion of a ma-

402

jority of this court, it requires us to reexamine the basis and method upon which alimony is awarded in this state.

I.

Marriage and divorce have existed in some form since the earliest phases of civilization.

Although divorce was apparently unknown in the Homeric age,[1] later, under the Athenian law (Circa 212 A. D.),[2] Greek husbands and wives could go their separate ways after the mere filing of notice with a magistrate; the law being in the hands of the parties—to marry, divorce and remarry at will.[3]

In Rome, where marriage was based in morality and religion, no divorces were had for the city's first 500 years.[4] Later, however, after the second Carthaginian War, free marriage, or *matrimonium sine conventione in manum mariti*, became the accepted practice.[5]

Although the Hebrews exalted marriage: that husband and wife should cleave together and be one flesh (Genesis 2:24, King James Version), the Mosaic Code permitted the husband to dismiss the wife for cause (Deuteronomy 24:1). Later, sanctioned by the Talmud, a wife could demand a separation. (Exodus 21:7-11.)[6] Beginning circa the Christian era, two schools arose at Jerusalem: the school of Shammai taught that only adultery could justify divorce; the school of Hillel authorized divorce for any cause. Under the latter, by the written law, in only two cases was a husband deprived of such power (Deuteronomy 22:13-19, 28, 29): the case of the ravisher and that of the husband who falsely accuses the wife of antenuptial incontinence;

---

[1] 2 Howard, A History of Matrimonial Institutions (1904), at page 12.

[2] *Id.*

[3] 2 Schouler, Marriage, Divorce, Separation and Domestic Relations (6 Ed. 1921), Section 1461.

[4] That involved the divorce of Sp. Carvilius Ruga circa 520 A. U. C. (*anno urbis conditae*, or circa 233 B. C.), 2 Howard, *supra*, at page 15, fn. 4.

[5] *Id.*, at page 15, fn. 2.

[6] *Id.*, at page 13, citing Milton's *Prose Works.*

in the latter instance he was not to put her away all his days. By the Mishnah, or oral law, other restrictions were imposed to make the exercise less arbitrary.'

Christian thought, as expressed in Matthew 5:31-32, 19:3-12, Mark 10:2-12, Luke 16:18, Romans 7:2, and 1 Corinthians 7:10-11, strongly encouraged a perpetual union, to be ended only by death or adultery. Thus, the basic tenet of Judeo-Christian marriage was that it be a perpetual union unto death (Genesis 2:24, Matthew 19:4-6, Mark 10:6-9, Luke 16:18, and Ephesians 5:31-33). However, the Mosaic Code had provided a *basis* for divorce, perhaps out of recognition that people cannot be forced to live together.[8]

In modern times, divorce has been controlled by the state or the dominant church. Divorces were not granted in English common law, but a divorce *a mensa et thoro* (a divorce from bed and board, or a legal separation) was allowed by the Ecclesiastical courts (which followed Canon law), and a divorce *a vinculo matrimonii* (a divorce from the banns of matrimony or an absolute divorce) was allowed only by special act of Parliament.[9] No other English authority possessed divorce jurisdiction until 81 years after our Declaration of Independence.[10]

---

[7] *Id.*, at page 13, fn. 3.

[8] In Matthew 19, the Pharisees "tempted" Christ by asking: "Is it lawful for a man to put away his wife for every cause?" (In obvious reference to Deuteronomy 24:1 and the school of Hillel.) Christ replied, "Moses because of the hardness of your hearts suffered you to put away your wives: but from the beginning it was not so." Matthew 19:8. Saul of Tarsus (the Apostle Paul) repeated the injunction against a divorce, but recognizing that a marital breakdown might occur, stated that if the wife does leave her husband, "let her remain unmarried, or be reconciled to her husband: and let not the husband put away his wife." 1 Corinthians 7:10-11.

[9] 2 Schouler, *supra*, Section 1460.

[10] The Divorce Act of 1857 (20 & 21 Vict. c. 85), ousted the Ecclesiastical courts of divorce jurisdiction, and established the absolute divorce by judicial decree. Vernier & Hurlbut, The Historical Background of Alimony Law and Its Present Statutory Structure, 6 Law and Contemporary Problems 197, 198.

404

In this state, divorces were granted by special acts of the General Assembly (see, *e. g.*, the divorce of Hannah from Isaac Willis in 2 Ohio Laws 67), and, later, pursuant to general statutes.

In the development of systems of divorce, "alimony"[11] emerged, its origins shrouded in the mists of history and metaphor.

The Ecclesiastical courts granted alimony from the husband to the wife strictly upon the basis of the husband's common-law duty to support the wife. Accordingly, if the divorce (*a mensa et thoro*) was granted for reason of the wife's misconduct, no alimony was awarded because a husband was obligated to support his wife only so long as they cohabited or were separated by reason of *his* misconduct.[12] On the other hand, since only very serious misconduct on the part of the husband warranted a divorce,[13] the courts generally awarded "alimony" to the wife in excess of bare sustenance.[14] Those awards were made, however, in the context of a marriage—the banns of matrimony intact.

In the absolute divorces granted by Parliament, it became a practice that divorces would not be granted unless pecuniary provision, called alimony, be made for the wife. That practice is criticized by an early writer:

"The Parliamentary practice of requiring the injured husband to make a provision for his delinquent wife had not much to commend it, either morally or legally. Morally it seems monstrous to compel a man to support through life the woman who has dishonored him; legally, she has no claim whatever, because after she has committed adultery, the husband may turn her out of doors. * * * What, therefore, can appear more strange than to call upon the

[11]Alimony derives from the Latin word "alere" which means to nourish or sustain.

[12]3 Blackstone Commentaries 94; Vernier & Hurlbut, *supra*, at page 199.

[13]*Id.*, at page 198.

[14]*Id.*, at fn. 10.

husband to secure her maintenance? Yet this was constantly done in Parliament, sometimes in the upper but often in the lower assembly." MacQueen, Divorce and Matrimonial Jurisdiction (1858) 55.

Whatever the legislative divorce practice in England, however, it appears that insofar as the courts of Ohio adopted[15] any "common-law" rules, such rules were those of the Ecclesiastical courts.[16]

The courts of this state have been favored with divorce statutes, and have, from the beginning, exercised jurisdiction to grant divorces *a vinculo matrimonii*. Also, from the earliest days of the Ohio judiciary, alimony has been granted as an incident of divorce jurisdiction. Early cases involve alimony awards to a current spouse (while separated or during the pendency of a divorce proceeding), and

---

[15]"The common law used by the courts in Ohio is not a copy of the English common law as it is in many states; for even though the English common law was introduced for adoption in the state, this provision was repealed in 1806. [4 Ohio Laws 38.]

"The relationship between the Ohio common law and the English common law was best explained by Judge Thurman in *Bloom* v. *Richords* (1853), 2 Ohio St. 387, 390, as follows:

" '* * * The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit of our federal and state constitutions and statutes, has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio. But wherever it has been found wanting in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, to wholly depart from it.' " (footnotes omitted.) *Thacker* v. *Bd. of Trustees of Ohio St. Univ.* (1973), 35 Ohio St. 2d 49, 67-71. (William B. Brown, J., dissenting.)

[16]In *DeWitt* v. *DeWitt* (1902), 67 Ohio St. 340, 344-345, the court states:

"We gather from a somewhat extended examination of authorities that, in so far as we derive any common law rules respecting divorce and alimony from the mother country, we inherited those administered in the Ecclesiastical courts, for, outside of parliament, no other tribunal had or assumed cognizance of such controversies. Such power did not, in England, belong to a court of equity. The Ecclesiastical court was not, and never had been, a court of equity. It was a canonical court, and never deviated from the canon law."

permanent alimony to be awarded to an ex-spouse subsequent to divorce. Although, we can find no historical basis", for the latter award, the courts of this and other states have drawn no distinction between it, and the historically valid alimony award to a present spouse.

Our analyses of each pronouncement of this court concerning alimony does disclose that a major reason for awarding "alimony" was to offset the harsh effects of the early property laws, under which a wife was incapable of holding property and all her rights to her personal property acquired before and after marriage became her husband's property.[18] Rather than revise those harsh property laws, American courts chose, perhaps inadvertently, to extend the coverage of "alimony" first, to a wife whose misconduct had been grounds for the divorce,[19] and, then, to

---

[17] Common-law courts lacked power over both alimony and divorce. The Ecclesiastical courts had power to award alimony, but no power to grant an absolute divorce. Equity courts had no power to grant alimony. *Fickel* v. *Granger* (1910), 83 Ohio St. 101, 104, citing Pomeroy on Equity Jurisprudence.

[18] *Walden* v. *Chambers* (1857), 7 Ohio St. 30, paragraph one of the syllabus and at page 34; *Fulton* v. *Fulton* (1895), 52 Ohio St. 229, 237-238; H. Platt, The Property Rights of Married Women, Section 1, at page 1 (1885).

[19] The following illustrates typical judicial deducement: "The injustice in many cases in not allowing the wife anything in the way of alimony, when the divorce is granted by reason of her aggression, has been pointed out in many cases. The property that the husband has may have been hers before marriage, or she may have contributed as much as he to its acquisition, and in many cases it would not be right that she should be turned away empty handed, merely because she can no longer live with her husband. And in some states such a division of the property has been decreed as alimony even in such cases, and it is for such reason that our statute provides that the court may adjudge her a share of the property. It is in reality an allowance of alimony or in lieu of alimony and in view of the suggestion of the court made in * * * [*Tappan* v. *Tappan* (1856)], 6 Ohio State [64], above referred to, and of the subsequent legislation we think the legislature must have contemplated that such share of the property was alimony, and consequently that it is included in the word 'alimony' where that word is used in Section 5706 providing for an appeal." *Fiesler* v. *Fiesler* (1910), 83 Ohio St. 200, 203, which involved the appealability of a disallowance of alimony to a wife at blame.

ex-wives, separated from their ex-spouse not by a divorce *a mensa et thoro*, but by a divorce *a vinculo matrimonii*. Ipso facto, it would appear that "alimony" drifted from its moorings when it ceased to be awarded exclusively within the context of a marriage, and acquired a life after marriage.[20] Such thought did not escape the advocacy of counsel

[20]Compare, however, the court's decisions to allow a separated, but not divorced, woman the beneficial aspects of the status of *femme sole*. *Benadum* v. *Pratt* (1853), 1 Ohio St. 403; *Wagg's Ex'r* v. *Gibbons* (1856), 5 Ohio St. 580; *Rosenthal* v. *Mayhugh* (1878), 33 Ohio St. 155.

Compare, also, the divergent path taken in the evolution of the law of dower, which arises from the marital relation in similar fashion, to the customary obligation of the husband to support his wife. Whether the right to dower survives an absolute divorce was decided in *Rice* v. *Lumley* (1857), 10 Ohio St. 596. Around 1826, the plaintiff, Narcissa, married Leonard Dixon. In June 1830, after Leonard disappeared, Narcissa procured a divorce *a vinculo matrimonii*. In April 1851, Narcissa brought an action asserting her right of dower in lands owned by Leonard who, after seven years absence, was presumed dead in 1837. The court denied her claim for dower. The opinion and syllabus of the court are identical, and read, in part:

"2. Dower is provided for by statute in Ohio, and is only allowed to *the widow* who was *the wife* of the person dying, at the time of his death.

"3. A woman who has obtained a divorce *a vinculo matrimonii* for the fault of her husband, under the statute of 1824, and afterward married another man, is not, after the death of the person who was her first husband, entitled to dower in his real estate.

"4. In such case the dower is not lost by way of forfeiture; but a woman divorced *a vinculo matrimonii* from her first husband, and by subsequent marriage the wife of another man, at the time of the death of the person who had been her first husband, is not *the widow* of the latter within the terms of the statute relating to dower." (Emphasis *sic*.)

The dissenting opinion states "* * * that when the divorce is granted to the wife, on account of the aggression of the husband, she is entitled to dower, and her subsequent marriage has no more effect on her right than the marriage of a widow."

The majority recognized that dower " ' * * * is a creature of the law, is born at the marriage altar, cradled in the bosom of the marital status as an integral and component part thereof, survives during the life of the wife as such and finds its sepulcher in divorce. * * *' " (*Simons* v. *Miami Beach Nat. Bank* [1965], 381 U. S. 81, 85, fn. 6), whereas the minority would have the incidences of the marital relation survive the absolute termination of the relationship.

for Mr. Piatt in *Piatt* v. *Piatt* (1839), 9 Ohio 37. That case, involving an ex-wife's execution action to enforce her alimony award, presented the ex-husband's novel and apparently audacious argument, at page 38, "* * * [t]hat it [the execution] is for *alimony*, while alimony can only exist while the relation of husband and wife subsists." (Emphasis *sic*.) The court's response to that assertion reads, at pages 40-41:

"The second point raised by counsel, that alimony can only exist while the relation of husband and wife continues, has no foundation on which to rest, and as Lord Holt once said, he must be a bold man who ventures on such an assumption. It is certainly opposed to the long continued and well settled practice of this court. The authority to grant alimony in this state, is derived from the 5th and 7th sections of the act concerning divorce and alimony, 29 O. L. 432. The fifth section provides, that where a divorce shall be decreed in case of the aggression of the husband, the woman shall be restored to all her lands and tenements, and be allowed out of her husband's real and personal estate, such share as the court shall think reasonable. Here is power conferred upon the court to dissolve the marriage contract, and allow such amount to the wife, as in its discretion may be thought just. Such allowance, it is true, is not in this place called alimony, but it is clearly intended such. But it is said this alimony must be allowed in gross, and can not be made payable in instalments. The answer to this is, the statute is silent on that subject, and therefore, like the amount to be allowed, is left to the discretion of the court. The practice has been so to decree. * * *"

Thirty years later, a similar voice was raised in *Cox* v. *Cox* (1869), 19 Ohio St. 502, where the ex-husband argued, at page 508, that "* * * a claim for alimony can only be asserted *while the marriage relation exists* [ citing cases]." (Emphasis *sic*.) The basis for his argument was that his ex-wife had applied for alimony in Ohio *after* an absolute divorce had been granted in Indiana. His arguments, not having been reasserted until this day, were answered by the court, at page 512, as follows:

"It is not essential to the allowance of alimony that the marriage relation should subsist up to the time it is allowed. * * * It is true the statute speaks of the allowance as being made to the wife. But the term 'wife'[21] may be regarded as used to designate the person, and not the actual existing relation; or the petitioner may still be regarded as holding the relation of wife for the purpose of enforcing her claim for alimony."[22]

Thus, post-marital alimony awards entered Ohio jurisprudence without fanfare, and absent a discernible conscious judicial origin. Alimony beyond notions of sustenance, and beyond the banns of matrimony, arrived, as Sandburg's fog, on little cat feet, unscrutinized by our sagacious predecessors against the standard of fundamental fairness.[23]

Although those who enter into marital contract swear or affirm its perpetuity, provision is made for dissolution— a judicial solution.[24] *Olin* v. *Hungerford* (1840), 10 Ohio

[21]In *Eggleston* v. *Eggleston* (1952), 156 Ohio St. 422, 428, this court placed a similar construction on the word "husband" where it authorized a proceeding to grant alimony even where the bigamous marriage was declared void:

"It is argued that, the defendant not being in fact and law the husband of the plaintiff, no award of alimony is authorized by the statute. Such view would apply a very narrow and technical definition of the word, 'husband.' "

[22]Upon remand, the ex-wife was awarded a sum for "alimony" which exceeded Mr. Cox's estate (wealth) prior to the divorce, because the awarding court thought that she should share in a post-divorce, $20,000 inheritance of Mr. Cox occasioned by the death of his father. This court held that the award was not erroneous because the awarding court had discretion to regard the "expectancy." *Cox* v. *Cox* (1871), 20 Ohio St. 439.

[23]In *Vanderbilt* v. *Vanderbilt* (1957), 354 U. S. 416, 425, Justice Frankfurter remarked, in his dissenting opinion, that "* * * it is not even settled what the relation of a state to an ex-wife and an ex-husband must be for the state, as a matter of due process, to be able to grant support on the basis that the parties were once man and wife."

[24]Proceedings in divorce and the granting of alimony are judicial functions which require the exercise of judicial power. Section 32, Article II of the Ohio Constitution; *Dewitt* v. *Dewitt* (1902), 67 Ohio St. 340, 349. Cf. *State, ex rel. Portage County Welfare Dept.*, v. *Summers* (1974), 38 Ohio St. 2d 144, 150-151.

268, illustrates the courts' struggles with the *sui generis*[25] proceedings in divorce and alimony which exhibit the mixed characteristics of partition actions and proceedings in chancery. However, this court has never held that any obligation of the marital relationship survives a decree of absolute divorce. To the contrary, this court has stated that no vestige of the marriage survives divorce. *Petersine* v. *Thomas* (1876), 28 Ohio St. 596, 599 ("* * * divorce contemplates a final separation of the parties. Their paths in life henceforth diverge, and, in legal contemplation, they are to each other as strangers."); *Pretzinger* v. *Pretzinger* (1887), 45 Ohio St. 452, 460 ("* * * After a dissolution of the marriage relation by divorce, the parties are henceforth single persons, to all intents and purposes. All marital duties and obligations to each other are at an end, and they become as strangers to each other."); *Fulton* v. *Fulton* (1895), 52 Ohio St. 229, 240-241 ("Where a divorce *a vinculo,* is decreed, the bonds of matrimony are dissolved, and the former husband and wife become as strangers to each other, and the former wife is relieved from all the disabilities and duties incident to coverture. * * * By the divorce *a vinculo,* the mother is as completely absolved from the marital relation as she would be by death * * *.").

Although post-marital alimony has been said to *arise out of* the husband's duty to support his wife,[26] "* * * [t]he *legal obligation* of the husband to furnish support to the wife ceases upon the termination of the marriage relation." (Emphasis added.) *Lockwood* v. *Krum* (1877), 34 Ohio St. 1, 7.

At this point we end our quest for an ascertainable and legitimate basis for post-marital alimony, properly so-called, because we are confident that modern legal principles

[25]An alimony award is not an ordinary judgment for purposes of dormancy (*Peeke* v. *Fitzpatrick* [1906], 74 Ohio St. 396), nor is it a provable claim in bankruptcy (*Lemert* v. *Lemert* [1905], 72 Ohio St. 364). Accord *Audubon* v. *Shufeldt* (1901), 181 U. S. 575.

[26]*Fickel* v. *Granger* (1910), 83 Ohio St. 101, 106, paragraph one of syllabus.

ciples cannot harbor such an anachronistic notion. Rather, it is our considered opinion that most awards of property incident to a final divorce are readjustments of the party's property rights, and "* * * [w]hether in the judgment such adjustment is called 'alimony' or 'division of property' * * * [has not been considered] important * * *" (*DeMilo* v. *Watson* [1957], 166 Ohio St. 433, 436, Zimmerman, J.), by parties, bench or bar.

Indeed, the General Assembly, although continually authorizing the awarding of "alimony," has never defined that term, but in referring to it imbues it with somewhat more force than mere sustenance. In the early statutes, "alimony" appears to be a prize for virtue and a punishment for depredation, as well as a "share" of the husband's separate property, plus a return to the wife of property she forfeited by coverture.

Beginning with 38 Ohio Laws 37 to the present, however, the General Assembly has directed that alimony be awarded in specific personal or real property or in a specific "sum of money," which is payable in installments or in a lump sum (in gross). We read that particular language as enjoining the court, at the time of decreeing the divorce, to settle all property rights with certainty and if a definite sum of money is due the wife, it may be ordered paid by the husband in installments if he cannot pay it in gross. Certainly, there is no legislative contemplation or authorization that an ex-husband be ordered to pay periodically, a sum determined by what he can afford, for an indefinite period of time. Such interpretation would be manifestly unfair not only to the husband, who, through the caprice of longevity might eventually pay an astronomically excessive sum, but also to the wife, who might only receive a fraction of what is due her through the death of her ex-husband, or her own remarriage or death.

Courts have long recognized that the monetary provision made for wives at divorce casts a mixed hue of "alimony" and a division of property. In *Tolerton* v. *Williard* (1876), 30 Ohio St. 579, 587-588, it was deemed an equity,

and "* * * not the less so that it is made under the name of alimony * * * when the husband receives property of his wife by marriage, or converts his means into real estate, taking the title in his own name, or when the wife, from her industry, economy, and business capacity, contributes largely to the accumulation of a fortune, it is equitable and just that she should have a large share in such property, on divorce for the husband's fault."

*Weidman* v. *Weidman* (1897), 57 Ohio St. 101, 104, states:

"The property of the husband is usually the result of the joint efforts of both husband and wife, and upon dissolution of the marriage she is entitled to her equitable share of the property as alimony. The amount of the equitable interest in the property can only be ascertained by a court upon a full hearing of all the facts and surroundings concerning the parties. Her equitable interest in such property is so connected and interwoven with the marriage relation, that it can be best ascertained and separated in the same action in which the marriage contract is severed by divorce."

In *State, ex rel. Cook,* v. *Cook* (1902), 66 Ohio St. 566, 573, the court speaking through Spear, J., stated that beyond an amount awarded for support and sustenance "* * * the provision for alimony is an allowance. It is in the nature of a partition. Recognizing the right of the wife to participate in the accumulations which are presumably the result of their joint efforts and joint economies, and having in mind at the same time any property which may have come to the husband by the marriage, the law wisely awards the wife a just and equitable proportion of the whole, and for purposes of convenient execution and to meet all varying situations, this allowance may be made either in real or personal property, or both, or in money, payable in gross or in installments, as to the court may seem reasonable. The court does not decree alimony as a debt to the wife. or as damages to be paid to her by her late husband, but as a part of the estate standing in his name in which she has

a right to share, fixed by the court in its discretion and thus appropriated to her, and to which she thereupon becomes legally entitled."

## II.

The prophetic statements in *Tolerton*, *Weidman* and *Cook* reflect the proper function of a court in the allocation of rights and responsibilities which must be parceled out at the dissolution of a marriage. The court must approach the proceeding much like a suit in partition or an action to dissolve, windup and distribute the assets and liabilities of a partnership. Current solutions[27] for resolv-

---

[27]See, *e. g.*, Note, The Implied Partnership: Equitable Alternative to Contemporary Methods of Postmarital Property Division, 26 U. of Florida L. Rev. 221; Comment, The Economics of Divorce: Alimony and Property Awards, 43 U. of Cincinnati L. Rev. 133, 152 ("* * * The division of marital property should be viewed in the same light as a 'shared enterprise or joint undertaking.'"); Comment, Division of Marital Property on Divorce: A Proposal to Revise Section 3.63, 7 St. Mary's Law Journal 209, 226 ("* * * [T]he marriage relationship assumes an even greater resemblance to a partnership. Therefore like a partnership the assets or fruits of that partnership should be equally divided upon dissolution."); Foster & Freed, Marital Property Reform in New York: Partnership of Co-Equals?, 8 Family Law Quarterly 169, 176 ("* * * Marriage should be regarded as a partnership of co-equals with a division of labor that entitles each to a one-half interest in the family assets accumulated out of partnership activity while the marriage is functioning. We believe that such a system reflects the contemporary understanding of marriage and the reasonable expectations of the parties. We would exclude from 'family assets' such separate property as was owned before marriage, or individually received by gift, bequest, devise or descent, and hence not derived from the partnership enterprise. We also would exclude from family assets property which was accumulated after separation or breakdown of the marriage and items of a purely personal character, viz., clothing and jewelry, sport and hobby equipment, etc. That which was produced when the family was a going concern ordinarily should be equally divided upon divorce, no matter how title was held, and regardless of blame for the breakdown of the marriage"); Inker, Walsh & Perocchi, Alimony and Assignment of Property: The New Statutory Scheme in Massachusetts, 10 Suffolk U. L. Rev. 1, 3. ("The courts have observed that the strong drive for economic independence by women will have significant effects for the setting of alimony awards. Coupled with the

414

ing the unfairness and unpredictability of contemporary divorce practice urge .courts to manage the dissolution of marital contracts in ways essentially identical to the foregoing statements of this court.circa 1876-1902.

The courts of this state have always derived the power to award "alimony" from the statutory law.[28] The current provisions of R. C. 3105.18 set forth an 11-factor guide for determining, first, "whether alimony is necessary," and, secondarily "the nature, amount, and manner of" payments of the sum allowed as "alimony." Many of those factors have little relevance to a possible need for sustenance, e. g., the duration of the marriage, the standard of living of the parties established during the marriage, the property brought to the marriage by either party, the contribution of a spouse as homemaker, and the relative, situation of the parties. On the other hand, those factors are quite pertinent to considerations of the distributions of marital assets and liabilities—the property settlement.

Only after a division of property is made,[29] is the court statutorily authorized to consider whether an additional amount is needed for sustenance, and for what period will such necessity persist.

Any grant of "alimony" for sustenance is necessarily co-extensive with the court's determination that it is needed and warranted. Such authentication and supervison is accomplished through the continuing jurisdiction of the court.

---

changing economic status of women is the social reality that marriage is a joint enterprise and shared undertaking, based on a division of labor, which should entitle each spouse to a share of the family assets upon divorce.") (Footnotes omitted.)

[28]"In divorce and alimony cases, courts have only such power with respect to awarding alimony as are authorized by statute." Snouffer v. Snouffer (1937), 132 Ohio St. 617, 623; Miller v. Miller (1951), 154 Ohio St. 530, paragraph one of syllabus; Marleau v. Marleau (1917), 95 Ohio St. 162, syllabus; DeWitt v. DeWitt (1902), 67 Ohio St. 340, 347; Conrad v. Everich (1893), 50 Ohio St. 476, 479; Gallagher v. Fleury (1881), 36 Ohio St. 590, 593.

[29]Herein, appellee received $350,000 as a "division of property" under Item 10 of the agreement, supra.

## III.

The necessary premise of all four assignments of error is that the court was without jurisdiction to modify the alimony decree.

*Olney* v. *Watts* (1885), 43 Ohio St. 499, is the first significant treatment by this court of jurisdiction to modify an alimony decree. The court phrased the question, at page 507:

"The real contention. touches the right and duty of the court in a case like this to review, modify, or vacate a former decree granting alimony payable in installments by an original suit or proceeding instituted for that purpose, when such power had not been reserved by the language and form of the former decree."

The court concluded that a decree of alimony, payable in installments for the continuous support of the ex-wife, is subject to subsequent modification by the court, but that if the amount so awarded was actually a *permanent and final division of property*, the court would be incompetent to modify it.

In *Law* v. *Law* (1901), 64 Ohio St. 369, the above statement from *Olney* v. *Watts* was rejected in a holding that the terms of a decree which were fixed by agreement of the parties, is not subject to modification. The court's apparent *ratio decidendi* is that the obligations assumed by the wife in the decree were given in consideration for the surrender of property rights to the husband, and to detract from one side of the balance would manifestly prejudice the wife.

*Law* v. *Law* served as the basis for denying modification of a 19-year-old divorce decree at the request of an ex-wife in *Newman* v. *Newman* (1954), 161 Ohio St. 247. The court, determining that the monetary allowance to the wife had been arrived at by agreement of the parties and involved alimony *and* a division of property, justified its decision, at pages 250-51, as follows:

"The parties voluntarily entered into a valid contract without mistake, misrepresentation or fraud. At their

instance the agreement was submitted to the court and was duly approved. It properly was incorporated into the decree, and plain justice would seem to require that it be considered as binding *both* parties thereto." (Emphasis *sic*.) If it was intended to extend the rule of nonmodification of a decree based upon an agreed alimony award involving property rights to that involving only a sustenance alimony award agreed to by the parties, it is not expressly discernible from the opinion.

*Mozden* v. *Mozden* (1954), 162 Ohio St. 169, extended *Law* and *Newman* to hold that an alimony decree is not modifiable where it is based upon an *oral* agreement of the parties. However, the decision, like *Newman*, does not make clear whether the continuing alimony award was independent of, or was consideration for, the party's property settlement.

Finally, *Hunt* v. *Hunt* (1959), 169 Ohio St. 276, came before this court and caused it to "follow and extend" *Olney* v. *Watts, supra,* and to distinguish *Law* and *Newman, supra.* The court ruled that a "* * * reservation of jurisdiction is implied so that the equitable power of the court may be invoked to modify its order * * *" (at page 289) when it becomes "* * * obnoxious to a sense of decency to [continue to] require" (at page 282) an ex-husband to support his remarried ex-wife.

All those cases allude to the inviolability of an alimony decree which is formulated by the incorporation of an agreement of the parties.

That topic is also the subject of Annotation, Divorce: Power of Court to Modify Decree for Alimony or Support of Spouse Which Was Based on Agreement of the Parties, 61 A. L. R. 3d 520. The annotation makes two basic findings: (1) Many courts have held that provisions of a divorce decree for periodic payments of alimony are subject to modification, even though based on an agreement of the parties, and (2) courts generally lack power to modify the terms of a property division settlement (by whatever name)

which has been incorporated into a decree.[30] Under the former finding, courts have relied upon (a) the amorphous concept of public policy (*Id.*, Section 4[d], page 554), (b) the theory that the incorporated "* * * agreement is not binding on the court but merely advisory to it, and, therefore, does not affect the power to modify the decree" (*Id.*, Section 4[a], page 551) and (c) the concept that the agreement loses its nature as a contract[31] the moment it is adopted by the court and *merged* into the decree by incorporation (*Id.*, Section 4[b], page 552).

In our opinion, the latter rationale is not only more legally and intellectually defensible than any other suggested, but, also, has been the view adopted previously by this court.

This court has held that where an agreement is incorporated in a decree, the agreement is superseded by the decree, and the obligations of payment of alimony[32] and child support[33] imposed thereby are imposed not by contract but by decree.

Even though this court has accepted the principle of merger in contempt proceedings, such rule has been never

---

[30]"* * * it is generally recognized that a court does not have the inherent power to modify a true property settlement or a decree incorporating it.

"Thus, the rule has been developed that where an agreement's provisions for support are an integral and inseparable part of the property settlement, as where the payments are in consideration for a transfer of property, a decree based on that agreement cannot be modified with respect to support. Conversely, if the provisions for support and for the settlement of property rights are clearly separable, though contained in one instrument, the court has the power to modify the support provisions of the decree even though it cannot alter the settlement of property rights." 61 A. L. R. 3d, Section 19[a], at page 590.

[31]Compare the situation of the contract to sell land which merges in the subsequently executed deed. But, see, *Mendelson* v. *Mendelson* (1930), 123 Ohio St. 11, which opines that an unincorporated separation agreement is not extinguished by a divorce decree.

[32]*Holloway* v. *Holloway* (1935), 130 Ohio St. 214.

[33]*Robrock* v. *Robrock* (1958), 167 Ohio St. 479.

directly applied in alimony modification proceedings. We herein expressly adopt such application.

Thus, inasmuch as decretal provision for "alimony" is not a contractual obligation, there is no basis for considering the decree inviolable and unassailable; contract rights are not impaired by future modification of decretal alimony provisions.[34]

Consistent with the great weight of authority, even though there is a merger of the contract into the decree, the decree is still not subject to modification if the alimony award is not solely for support but is in settlement of the property rights of the parties. Insofar as the syllabi in *Law*, *Newman*, and *Mozden* fail to reflect such distinction, they are accordingly modified.

It is self-evident that a separation agreement, which purports to set a fair level of alimony for sustenance, as well as divide and distribute the property of the parties and settle their affairs, is not necessarily continually fair and equitable thereafter. We may assume that it is fair at the moment of its execution, and that it continues to be fair at the time of divorce if the parties offer it for inclusion and merger into the decree. At that point, all that can be said is that it sets a fair and equitable "initial level" of obligations.[35]

Such initially fair agreements may be rendered manifestly oppressive in countless situations, such as where the custodian of the children fails to provide proper care and guidance, or where the receiver of alimony makes no

[34] "It would seem to me that the prohibition against the impairment of the obligation of contracts is without application when an agreement having to do with the support of minor children is embodied in the divorce decree. The contractual character of such agreement disappears through absorption. The decree, product of judicial action, becomes the controlling thing of exclusive concern and *its* modification is the matter presented to the court. * * *" *Tullis* v. *Tullis* (1941), 138 Ohio St. 187, 202, Zimmerman, J., dissenting. (Emphasis *sic*.)

[35] Editorial, Modifiability of Alimony and Support Decrees in Ohio, 36 U. of Cincinnati L. Rev. 487, 494.

attempt at self-support[39] or where the economic situation of either or both of the parties drastically changes. The holding in this case, that a court has continuing modification jurisdiction over alimony for sustenance awards, is to assure that such awards are continually just.

In summary, we hold, therefore, that where an alimony award is for support only, is for an indefinite amount, and where there is no property settlement, or if there is such a settlement, the support award is independent thereof, the jurisdiction of the court to modify will be implied in the decree irrespective that such support order is based upon an agreement of the parties.

We are of the view that the award of $35,000 in Item 9, which is sought to be modified, is separable from the $350,000 award in Item 10 by reason of the wording in Item 9 that the award is "[i]n satisfaction of Wolfe's obligation to *support* and maintain Mrs. Wolfe * * *" whereas Item 10 states "[a]s a *division of property* and in *further* satisfaction of Wolfe's obligation to support and maintain Mrs. Wolfe * * *:" (Emphasis added.) Inasmuch as those clauses are clearly separable, the trial court had modification authority. Further, we view the alimony award as indefinite, even though provision is made for termination upon appellee's remarriage or her death. The occurence of those two conditions subsequent is necessarily indefinite.

The question remains, however, for even though the court had modification authority with respect to alimony for sustenance awards, whether it may or should be exercised to terminate an alimony award by reason of post-

---

[39] See. *Commonwealth* v. *Whiston* (1940), 306 Mass. 65, 66, 27 N. E. 2d 703, 704 ("* * * We know of no law that assures the right to a life of idleness to every married woman living apart from her husband for justifiable cause."); *Morgan* v. *Morgan* (1962), 59 Wash. 2d 639, 642, 369 P. 2d 516, 518. ("* * * When the wife has the ability to earn a living, it is not the policy of the law of this state to give her a perpetual lien on her divorced husband's future income."); Comment, The Economics of Divorce: Alimony and Property Awards, 43 U. of Cincinnati L. Rev. (*supra*), at fn. 49.

divorce unchastity or similar misconduct. Such question is novel in this and other Ohio courts.

In Annotation, Divorced Wife's Subsequent Misconduct as Authorizing or Affecting Modification of Decree for Alimony, 6 A. L. R. 2d 859, the following statement appears under editorial summary: "There is a marked conflict of authority on the question whether the fact that a divorced wife is guilty of immoral conduct after the divorce is a ground for reducing or terminating alimony payments. Perhaps a majority of the courts state that such conduct is a ground for modification, although some of the decisions are mere dicta. * * *"

In 2A Nelson, Divorce and Annulment (2 Ed.), 92, Section 17.19, it is stated: "Conduct of an ex-wife which would be unbecoming were she still bound by marital ties is not ground for modification of alimony or support provisions of a decree which has severed those ties. According to some courts, actual immorality on her part may be considered in connection with a motion to modify; but others take the position that, even though she is living in adultery, it is no concern of the ex-husband and not, of itself, ground for insisting upon modification of his obligations under the decree."

We are of the view that such unchastity as disclosed in the record before us does not per se require, by reason of public policy, a full termination of an alimony award. It is, however, a circumstance that could and should be considered as to modification or termination. In *Garlinger* v. *Garlinger* (1975), 137 N. J. Super. 56, 347 A. 2d 799, in a case similar to this, the court stated, at page 803, after adopting a rule that post-divorce unchastity by the wife may be considered in a modification proceeding, the following:

"We have no doubt, however, that where a former wife chooses to cohabit with a paramour, whether in her abode or his, or otherwise consorts with him, the issue may well arise whether, in the circumstances, she has further need for the alimony. If it is shown that the wife is being support-

ed in whole or in part by the paramour, the former husband may come into court for a determination of whether the alimony should be terminated or reduced. Similarly, if the paramour resides in the wife's home without contributing anything toward the purchase of food or the payment of normal household bills, then there may be a reasonable inference that the wife's alimony is being used, at least in part, for the benefit of the paramour, in which case it could be argued with force that the amount thereof should be modified accordingly. In short, the inquiry is whether the former wife's illicit relationship with another man, apart from the misconduct *per se,* has produced a change of circumstances sufficient to entitle the former husband to relief.''

In the initial grant of alimony at the time of decree, the need for, and the amount of, such award rests within the discretion of the court subject to consideration of the specifically enumerated factors in R. C. 3105.18. Likewise, upon modification, such utilization of discretion is required.

The trial court in this case, in the exercise of its discretionary powers, terminated the alimony award. In light of the total circumstances appearing in the record it does not clearly appear that such termination constituted an abuse of discretion. Additionally, the issue of abuse of discretion was not presented in this court or in the Court of Appeals.

As indicated in *DeMilo, supra* (166 Ohio St. 433), the courts and parties have frequently failed to delineate whether the award was for sustenance or constituted a property division for the reason such delineation was not considered important. In holding herein that modification jurisdiction continues as to alimony sustenance awards, even though based upon agreements of the parties, we perceive that immeasurable difficulties will arise in attempting to judicially determine the character of the award in a given case. Therefore, while we apply the rule here because the separation is clearly manifested, our holding herein is to

be applied prospectively only to decrees incorporating separation agreements entered after the date of this judgment.

*Judgment reversed.*

O'NEILL, C. J., STEPHENSON and STERN, JJ., concur.

P. BROWN, J., concurs in paragraphs one, two and four of the syllabus and in the judgment.

CORRIGAN and CELEBREZZE, JJ., dissent.

STEPHENSON, J., of the Fourth Appellate District, sitting for HERBERT, J.

PAUL W. BROWN, J., concurring. My concurrence in the majority opinion indicates my agreement with the principles there recognized—that a separation agreement merges in a decree of divorce when incorporated therein; and that the decree is thereafter subject to the continuing jurisdiction of the trial court, so that it may be modified in the event of demonstrated need for such modification, and examined with a view to determining its continued enforceability under its own terms.

I do not conclude that an agreement between the parties, once merged into a divorce decree, may be arbitrarily disregarded, but to the contrary, that compelling reasons and a sound exercise of discretion must appear in an order which modifies or terminates such a decree.

Here, the trial court gave the following reasons for the termination of the payments of alimony for the sustenance of the wife:

"* * * [W]e have had her [the appellee's] admissions that she did, for a long period of time, up until and after the filing of this motion, live with another man, cohabited with this other man in her home in the presence of the children, traveled with him as husband and wife, bought airplane tickets as husband and wife, registered as husband and wife and has, in fact, held herself out to others as being husband and wife, both by her purchase of the tick-

ets and her going on these trips, registering in motels and her living together in the Scottsdale community with him and with her children, so that she has, in fact, held herself out as the wife of Mr. Erickson."

"The court has to recognize that, as counsel on both sides have pointed out, that this behavior or conduct of the living together or registering together in motels as husband and wife, together, certainly, apparently goes on today."

"The court finds that to be a fact in this case. Now, the court has previously ruled that it would be against public policy for a court to enforce an alimony order where the wife, who was receiving the alimony, lived only with another person.

"Now, basing that on the fact of a common law marriage, and I think this is where we differ from the case you have, in the recent Court of Appeals decision. This isn't based on the fact that she has a common law marriage, but the fact that she, in effect, is holding herself out to others that she is married, that *she is, in fact, attempting to enjoy all of the benefits of a marriage by cohabiting with another man and yet not entering into an actual marriage in order to avoid the loss of the alimony.* [Emphasis added.]

"* * * I think that in this particular case, the separation agreement says that the alimony shall be terminated when Mrs. Wolfe remarries and I think her holding out that she has remarried is sufficient that this court should terminate that alimony and her conduct is such that this court could not, being consistent with public policy, enforce the alimony order that it has made by the acceptance of the separation agreement any further."

The record clearly discloses that the evidentiary basis for the trial court's conclusion is sound. The trial court's order terminating the alimony for sustenance is within my perception of that court's continuing jurisdiction, and since I find no abuse of discretion, I concur in the reversal of the judgment of the Court of Appeals, and the reinstatement of the trial court's order.

CORRIGAN, J., dissenting. There is nothing arcane about the provisions of the separation agreement under study in this case. It is free from qualification or limitation. The intent of the parties is plainly stated in Item 9: " * * * The liability of [Mr.] Wolfe for the payment set forth in this paragraph shall cease upon the happening of whichever of the following events shall occur first: (a) the remarriage of the wife; (b) the death of the wife. * * *"

Neither of these contingencies has occurred. Whether entering into the separation agreement in 1967 was wise or unwise on Mr. Wolfe's part, in view of his former wife's admitted scandalous personal behavior, flaunting her disregard of conventional moral standards of rectitude, is not for decision by this court. He is the architect of his own continuous mortification until one of the contingencies occurs. He is obligated by the terms of that agreement as long as he or his estate is able to fulfill its conditions.

I would affirm the judgment of the Court of Appeals.