JOURNAL ENTRY AND OPINION
This is an appeal from an order by Domestic Relations Judge Christine McMonagle adopting a recommendation by Magistrate Gregory Fuss, to deny appellant Robert J. Schmidt's motion to terminate spousal support. Schmidt claims he proved appellee M. Geraldine Schmidt was cohabitating with a man and that the judge erred when she applied the wrong definition of the term cohabitation when interpreting the parties' separation agreement. Moreover, he contends that such definition violated his constitutional equal protection rights. We disagree and affirm.
The couple married in November 1966 and filed their petition for dissolution of marriage on May 28, 1992. In their separation agreement, Schmidt agreed to pay as spousal support $36,000, plus 2% poundage per year for eight consecutive years commencing April 15, 1992. The agreement further provided that Schmidt's spousal support obligation * * * shall remain in full force and effect until the first to occur of [Ms. Schmidt's] death, remarriage or cohabitation. The dissolution became final on June 30, 1992.
On April 14, 1995, Schmidt filed a motion to modify or terminate his spousal support obligation on the basis that Ms. Schmidt was cohabitating with an unrelated male. On April 27, 1995, Ms. Schmidt responded by filing a motion to show cause alleging that Schmidt had failed and refused to pay the fourth annual support installment, and requested statutory interest, sanctions, attorney fees, and other relief.
The magistrate conducted hearings on Schmidt's motion on October 21 and 22, 1996, February 24, 25, and 27, 1997, March 12 and May 19, 1997. The evidence showed that, after the dissolution was final, Ms. Schmidt moved into an apartment in Shaker Heights and, in the fall of 1992, she began a sexual relationship with a male friend she had known for twenty years. They would socialize together and attend the orchestra and theaters.
In the fall of 1994, she began spending an average of three nights per week at his home, where she used his computer to work on her master's thesis and other university assignments. He had majored in English in college and would often proof-read her papers. In February 1995, immediately preceding their trip to France, she spent five nights in a row at his home, working toward completion of her thesis. When she knew she would be working at his home or her office at the university, she would forward her calls to the appropriate number. She also admitted making a few long distance calls from his phone in July 1994, but said she had reimbursed him for those charges in cash.
Other than two letters sent by Schmidt's attorney, Ms. Schmidt denied she received mail at her friend's Lytle Road home and explained that she had paid for his Cleveland Plain Dealer to assist the newspaper carrier, a single mother who had solicited Ms. Schmidt for the subscription.
In December 1994, Ms. Schmidt was renting one-half of a two-family house on Gridley Avenue in Shaker Heights, not far from Lytle Road. At the suggestion of her friend, who loaned her $10,000, she purchased the house for income and investment potential. This loan was secured with a promissory note and second mortgage on the home and she repaid it with interest by December 1995, shortly before refinancing her original mortgage.
Before first moving into the Gridley home, she gave her two cats to her friend, ostensibly to save them from the trauma of moving from place to place. When she later purchased the home, he kept the cats but she paid their veterinary bills and made various purchases of food and litter. Ms. Schmidt and her friend shared other interests besides cats: they performed together in a band; individually invested in a company called Trade Wins II; traveled, sometimes sharing frequent flyer miles; and, with a third person, collaborated on a book. Other than two musical instruments that they jointly purchased and their contributions to the book, they had no shared ownership in real or personal property or in bank accounts, and no joint debts. Neither was the beneficiary of the other's will, life insurance policies, retirement plans or other such benefits nor the authority to use the other's bank cards. When they traveled together, each paid his own way, and each would pay for the gas if using the other's car. Although each knew where the other's spare house key was hidden, neither had free access to the other's home.
By the time of the hearing, Ms. Schmidt had obtained a position at Ernst Young, had access to her own home and office computer and slept at her friend's home an average of less than two nights per week.
On February 9, 1999, the magistrate entered his amended decision with findings of fact and conclusions of law. In pertinent part, the magistrate concluded:
 It should be noted that [Mr. Schmidt] has by letter to this Court, (now a part of the record in the within hearing, acknowledged that he had been advised by prior and present counsel that his assertion of [Mr. Schmidt's] cohabitation failed to meet the standards set forth in current law, and that absent a showing of financial interdependence between [Mrs. Schmidt] and her friend, * * * he has no case. It was [Mr. Schmidt's] testimony that he was pursuing his action in an attempt to make new law. After a thorough review of the evidence presented in hearing and the pertinent case law, the Magistrate finds that current law more than adequately addresses [Mr. Schmidt's] cause of action and that that cause is wanting and without merit.
 [Mrs. Schmidt] and [her male friend] have been friends for over twenty years and, some time after the parties' Dissolution, they began to date and entered into a sexual relationship. The convincing evidence shows that at all times the two have maintained separate residences. Each receives their mail at their own separate residence and each has a [sic] separate phone and utilities. Each maintains their personal items and memorabilia in their separate residences. While [Mrs. Schmidt] and [her male friend] have with varying frequency spent the night at one another's residences, the evidence fails to show that they live together. They share a variety of interests (playing music together, working on a jointly authored book, going to the Orchestra or to plays), but keep their expenses separate. They do jointly own musical instruments on which, with a third person, they play in public and occasionally for pay. While they may shop for groceries together or use one another's phones for long distance calls, the convincing evidence shows that they re-imburse [sic] one another for their separate expenses.
 The convincing and credible evidence shows further that [Mrs. Schmidt] and [her male friend], maintain their own last names, have no plans for marriage, and hold themselves out (and are known) only as good friends. [Mrs. Schmidt] and [her male friend] each maintain separate bank accounts, separate investments, separate assets and separate liabilities. Neither has access to or permission to use the others' credit. No convincing evidence was presented to show that they have in any way commingled their finances. Evidence was presented showing that contemporaneous with the purchase of [Mrs. Schmidt's] home, [her male friend] made her a loan of ten thousand dollars. (Despite [Mr. Schmidt's] efforts to show this loan to be a sham or a [commingling] of assets, the evidence fails to support this assertion. Indeed the loan was repaid within a year). Nothing in the credible evidence presented shows that either contribute to the support of the other. While the evidence does show the occasional voluntary payment by one for some item for the other, these payments or gifts are akin to the generosity shown between close friends or persons dating and fall far short of the assumption of the other's support as delineated in case law.
In denying the motion to modify or terminate spousal support, the magistrate noted that Ms. Schmidt offered credible testimony to show that Schmidt had threatened to terminate her spousal support if she was ever with another man.
 It is apparent that [Mr. Schmidt] believes, or at least feels[,] that the standard has been met and that he should be able to stop paying spousal support to [Mrs. Schmidt] when she enjoys a sexual relationship after the parties' divorce. The Courts have, in the past repeatedly addressed this issue and found that the mere enjoyment of sexual relations after divorce is insufficient to constitute cohabitation. Where the Courts have already addressed this issue, there is, at the judicial level no need for new law.
Schmidt filed objections to the magistrate's decision on April 15, 1999, and on May 14, 1999, filed the hearing transcripts. On May 28, 1999, Ms. Schmidt filed her response. On July 9, 1999, the judge overruled the objections and adopted the magistrate's February 9, 1999 amended decision.
We address Schmidt's first and third assignments of error together.
 I. THE TRIAL COURT ERRED, AS A MATTER OF LAW[,] IN FAILING TO APPLY THE DEFINITION OF COHABITATION FORMULATED IN THE STATE V. WILLIAMS CASE.
 III THE TRIAL COURT ERRED BY IGNORING EVIDENCE OF THE INTENT OF THE PARTIES TO DEFINE THE INHERENTLY AMBIGUOUS TERM COHABITATION.
Schmidt argues that the judge should have defined cohabitation as the Ohio Supreme Court did in State v. Williams (1997), 79 Ohio St.3d 459,683 N.E.2d 1126, and, in the context of the domestic violence statute the Supreme Court simply used a basic rule of statutory construction and gave the term `cohabitation' its ordinary common[-]sense definition. Moreover, he contends the term is inherently ambiguous because domestic relations cases show appellate courts have given the term cohabitation varied definitions. It is his position that testimony at the hearings showed the parties intended that the term, as used in their dissolution agreement, has special meaning because, according to Schmidt, both understood that if, at any time, Mrs. Schmidt `was with' another man, [he] would cease support payments.
Ms. Schmidt argues the definition of cohabitation, for purposes of criminal domestic violence actions, does not require a finding that the parties have assumed rights, duties, and obligations equivalent to marriage, which includes the obligation of support, as is required to show cohabitation in domestic relations cases. A review of the Williams case, she asserts, indicates that the Supreme Court considered the term cohabitation solely within the confines and purpose of the domestic violence statute. She further submits that cohabitation as used in their separation agreement is not inherently ambiguous nor did they agree that the term should be construed to mean with another man.
The definition of cohabitation announced in Williams,79 Ohio St.3d at 465, provides:
 [T]he essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium. R.C. 2919.25(E)(2) and related statutes. Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.
Given the differing purposes of a contractual agreement and a criminal statute, we are not inclined to apply to a civil separation agreement, which delineates contractual rights, a definition adopted for the purpose of clarifying a statutory term as it applies to a criminal offense.
Moreover, a separation agreement is just that, an agreement which, if challenged, is subject to the rules of contract interpretation. The purpose of contract construction is to effectuate the intent of the parties, Skivolocki v. East Ohio Gas Co.(1974), 38 Ohio St.2d 244,313 N.E.2d 374, paragraph one of the syllabus, and a judge will presume that the parties' intent resides in the language they chose to use in the agreement, Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus. Interpretation of a clear and unambiguous contract term is a matter of law. Rulli v. Fan Co. (1997), 79 Ohio St.3d 374, 380, 683 N.E.2d 337.
The separation agreement provides for a specific amount in spousal support for a specific length of time contingent upon the death, remarriage or cohabitation of Ms. Schmidt. Because the term cohabitation is not defined within the contents of the agreement the ordinary meaning of the word must be used to give effect to the parties' intent.
"Cohabitation" is a term of art within the law and implies more than mere sexual relations. Thomas v. Thomas (1991), 76 Ohio App.3d 482, 485,602 N.E.2d 385, citing Wolfe v. Wolfe (1976), 46 Ohio St.2d 399,350 N.E.2d 413. In Guzowski v. Guzowski (Apr. 15, 1993), Cuyahoga App. No. 64107, unreported, we accepted the definition of cohabitation found in Black's Law Dictionary.
 Black's Law Dictionary (5 Ed.) 236 defines cohabitation in the following manner: [t]o live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations. Bussey v. Bussey(1988), 55 Ohio App.3d 117, 118 citing Bromberg v. Bromberg (April 7, 1983), Cuyahoga App. No. 45263, unreported; Miller v. Miller (Sept. 5, 1983), Cuyahoga App. No. 49279, unreported.
Quoting Bussey, supra, at 119, we further explained:
 * * * if it is shown that the wife is being supported in whole or part by the paramour, the former husband may come into court for a determination of whether the alimony should be terminated or reduced. Similarly, if the paramour resides in the wife's home without contributing anything toward the purchase of food or the payment of normal household bills, then there may be a reasonable inference that the wife's alimony is being used, at least in part for the benefit of the paramour * * *. In short, the inquiry is whether the former wife's illicit relationship with another man, * * * has produced a change of circumstances sufficient to entitle the former husband to relief.
Thus, when the term `cohabitation' is used in a divorce decree in the sense of an event which will alter obligations created in the decree, the judge must look to whether the parties have assumed obligations, including support, equivalent to those arising from a ceremonial marriage. Guzowski, supra, citing Taylor v. Taylor (1983),11 Ohio App.3d 279, 465 N.E.2d 476. Further,
 Alimony is provided for the needed support of the ex-spouse and, if the ex-spouse is living with another person to the extent that the other person provides support or is supported, then the underlying need for alimony is reduced or does not exist. Therefore, cohabitation, in the legal sense, implies that some sort of monetary support is being provided by the new partner or for the new partner. Without a showing of support, merely living together is insufficient to permit a termination of alimony. Bussey v. Bussey (1988), 55 Ohio App.3d 117, 563 N.E.2d 37.
Thomas v. Thomas (1991), 76 Ohio App.3d 482, 485, 602 N.E.2d 385; see In re Dissolution of Marriage of Briggs (1998), 129 Ohio App.3d 346,349, 717 N.E.2d 1110.
While the Williams definition of cohabitation includes aspects of financial and sustenance support, we cannot conclude that the definition adopted by the Supreme Court for the purpose of clarifying the term cohabitation as it applies to the domestic violence statute provides the ordinary meaning for purposes of defining contractual, domestic relations obligations under a separation agreement. We also cannot conclude that the parties intended the word cohabitation to mean to be with another man, since such a broad and ambiguous definition is not within the ordinary meaning of cohabitation in the context of domestic relations law. Therefore, as used in the separation agreement, the judge correctly applied the ordinary meaning of the term cohabitation as defined by domestic relations law. The first and third assignments of error are overruled.
In his fourth and fifth assignments of error, Mr. Schmidt argues:
 IV. THE DEFINITION OF COHABITATION USED BY THE TRIAL COURT VIOLATES MR. SCHMIDT'S EQUAL PROTECTION RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.
 V. THE DEFINITION OF COHABITATION USED BY THE TRIAL COURT CREATES A STANDARD THAT IS LEGALLY IMPOSSIBLE TO MEET.
Schmidt argues that the judge's definition of cohabitation violates his equal protection rights under Section I of the Fourteenth Amendment to the United States and Section 2, Article I of the Ohio Constitution because it requires him to show that Ms. Schmidt's friend was supporting her when, if she and her friend were married, her second husband would not have to provide such support. He contends, that to require him to prove that Ms. Schmidt's friend financially supports her wrongly imposes upon him a higher duty of support to establish cohabitation than that required by marriage. He further claims it also presents a legally impossible standard to meet, since there is no relationship where parties can legally assume an obligation of support.
Ms. Schmidt responds that Ohio law requires each spouse to support the other to the extent they are able to do so. The question of cohabitation, she asserts, is whether the couple have assumed marital rights, duties, and obligations, including the obligation of support and that the definition of cohabitation adopted by the judge does not create an impossible standard.
R.C. 3103.03(A) provides in pertinent part,
 Each married person must support the person's self and spouse out of the person's property or by the person's labor. If a married person is unable to do so, the spouse of the married person must assist in the support so far as the spouse is able.
Ms. Schmidt correctly points out that the statute involves a mutual support obligation and that Schmidt's proposition that his rights to equal protection of the laws are violated because a spouse has no obligation to support another is faulty. Ohio State University Hosp. v. Kinkaid (Ohio 1990), 48 Ohio St.3d 78, 549 N.E.2d 517, paragraph one of the syllabus.[1] The determination about a person's ability to aid in the support of his or her spouse is a matter to be decided within the sound discretion of the trial judge. Id. at paragraph two of the syllabus.
Therefore, because one spouse has the statutory duty to support the other in the circumstances described by case law, the definition of cohabitation as applied by the judge does not place upon Schmidt a higher duty of support in his capacity as a former spouse, and his federal and state constitutional rights to equal protection of the laws are not called into play. Rather, Schmidt
freely entered into a contractual agreement to pay a given sum of money to Mrs. Schmidt for a given period of time, until Ms. Schmidt is involved in a relationship which satisfies the legal definition of cohabitation. Therefore, his fourth and fifth assignments of error are overruled.
In his second assignment of error, Mr. Schmidt argues:
 II. THE TRIAL COURT'S FINDING OF NO COHABITATION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Mr. Schmidt complains the evidence clearly showed that Ms. Schmidt and her friend cohabitated because they shared expenses, household chores and meals, and lived together on a sustained basis which included a long-term, monogamous sexual relationship. Ms. Schmidt counters that there is no financial commingling, no evidence of cohabitation, and no evidence of a relationship tantamount to marriage.
The question of cohabitation is to be determined by the trier of fact. Nemeth v. Nemeth (1997), 117 Ohio App.3d 554, 558, 690 N.E.2d 1338; Guzowski v. Guzowski (Apr. 15, 1993), Cuyahoga App. No. 64107, unreported, citing Fuller v. Fuller (1983), 10 Ohio App.3d 253,461 N.E.2d 1348. If the judgment of the judge is supported by some competent, credible evidence going to all the essential elements of the case, an appellate court will not reverse it as against the manifest weight of the evidence. Guzowski, supra, citing Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273.
Schmidt failed to satisfy his burden of showing that Ms. Schmidt and her friend contributed to the other's support. The $10,000 loan made contemporaneous to the purchase of the Gridley avenue home was just that — a loan which was repaid within a year with interest. There was no evidence that Ms. Schmidt and her friend commingled their finances. As the magistrate noted, the occasional voluntary payment by one for some item for the other, were gifts akin to the generosity shown between close friends or persons dating and fall far short of the assumption of the other's support. The manifest weight of the evidence did not show that Ms. Schmidt and her friend were cohabitating. This assignment of error is without merit.
It is ordered that the appellee recover from appellant her costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH ROCCO, J., CONCUR; TERRENCE O'DONNELL, P.J. CONCURS IN JUDGMENT ONLY.
[1] See, also, R.C. 3103.03(C) (If a married person neglects to support the person's spouse in accordance with this section, any other person, in good faith, may supply the spouse with necessaries for the support of the spouse and recover the reasonable value of the necessaries supplied from the married person who neglected to support the spouse unless the spouse abandons that person without cause.).