Dora M. HAMEL, Appellant,

v.

Charles HAMEL, Appellee.

No. 86–1305.

District of Columbia Court of Appeals.

Argued Dec. 3, 1987.

Decided March 15, 1988.

Jo Wiese, Washington, D.C., for appellant.

Laurence M. Kahn, Washington, D.C., for appellee.

Before MACK, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant Dora M. Hamel appeals the termination of support payments from appellee Charles Hamel pursuant to a separation agreement which was incorporated and merged into a consent order. Her principal contentions are that the trial court applied the incorrect standard in deciding to terminate her support payments or, alternatively, abused its discretion in applying the correct standard. We hold that spousal support set forth in a voluntary separation agreement that is merged into a consent order is subject to modification by the court upon a showing by the movant of a material change in circumstances, and that the trial court therefore applied the correct standard. However, because a motion to modify support set by a court order is not the occasion to reweigh the equities between the parties, and the trial court did so, we hold that the trial court abused its discretion; accordingly, we reverse.

I.

The parties were married in 1966 in the District of Columbia and continued to live here until they separated on July 21, 1975. On March 4, 1976, Mr. Hamel obtained an ex parte divorce in Alaska. The next week Mrs. Hamel filed in the District of Columbia for divorce, child support, alimony and other relief. On June 14, 1976, the parties entered into a separation and property settlement to settle "all rights." The sixteen-page agreement gave full faith and credit to the Alaska divorce and included eight separate articles concerning alimony and child support, property, insurance, release and waiver, attorneys' fees, and merger and enforcement; each party was represented by counsel in the preparation of the agreement. On November 17, 1976, a consent order incorporating and merging the separation agreement was filed in the trial court.

Nine years later Mrs. Hamel filed a motion to collect $12,952.72 in arrearages in support payments for the period February to October 1985. Mr. Hamel responded by filing a motion for child support, termination of alimony and other relief, and sought denial of the motion for arrearages. The trial judge granted Mrs. Hamel's motion for arrearages, and thereafter denied Mr. Hamel's motion for reconsideration. In regard to Mr. Hamel's motion to termi-

nate alimony, Mrs. Hamel filed an opposition on the grounds that the requested termination failed to come within the terms of the separation agreement, which specified when support could be terminated, and that Mr. Hamel had not suffered a material change in circumstances since the previous reduction of support upon court transfer of custody of the parties' two children from Mrs. Hamel to Mr. Hamel on October 13, 1982. *See Hamel v. Hamel*, 489 A.2d 471 (D.C.1985) (affirming transfer of custody). Following evidentiary hearings, the trial judge granted Mr. Hamel's motion to terminate his support of Mrs. Hamel. *Hamel v. Hamel*, 114 Daily Wash.L.Rptr. 1941, 1947 (D.C.Super.Ct. Aug. 4, 1986).

In a memorandum opinion, the trial judge found that Mr. Hamel had demonstrated "a material change in the circumstances of the parties since the consent order requiring that the payments be made was issued." 114 Daily Wash.L.Rptr. at 1941. The judge referred specifically to the 1982 change in custody of the parties' children, the demise of Mr. Hamel's business ventures and consequent reduction of his income and change in his life style,[1] and his present indebtedness. *Id.* at 1946. Rejecting Mrs. Hamel's contention that the evidence demonstrated that Mr. Hamel's present financial condition was the result of his voluntary actions, the judge found that Mr. Hamel's

> efforts to expose the alleged illegal activities of the oil company which had terminated his contract seem[ ] totally reasonable, since [Mr. Hamel] testified that the efforts he took were for the purpose of re-establishing himself in the oil business, which had been extremely lucrative for him. Moreover, the Court concludes that [Mr. Hamel] has taken reasonable

steps to earn income by other means while pursuing the dispute with the oil company, having sought to establish a business in the structured settlement field.

114 Daily Wash.L.Rptr. at 1946 n. 8.

The judge further found that Mrs. Hamel was "a well educated, intelligent and healthy 51 year old woman [who] holds two temporary jobs and has the ability to earn an income in a number of different areas." *Id.* at 1947. In the judge's view she "could earn a minimum of $13,500 per year with her existing skills [and] the evidence actually suggested that [she] could make substantially more in the present job market." *Id.* at 1947 n. 17. Comparing the parties' financial needs and obligations, the judge noted that Mr. Hamel

> is the sole source of support for the children's financial needs [while] [Mrs. Hamel] has no present obligation to monetarily contribute toward the children's support, and in fact has not done so, has the ability to work and earn an income and has assets which she can utilize to provide for her financial needs.[2]

114 Daily Wash.L.Rptr. at 1947. The judge therefore concluded that

> the payment of the alimony award has become 'unduly burdensome,' *Tinney v. Tinney*, [209 A.2d 927 (D.C.1965)]; that [Mr. Hamel] needs all of the funds he can muster to provide for his present family's financial needs; and, that [Mrs. Hamel] has the financial means to independently provide for herself....

*Id.* at 1947. He therefore terminated all of Mrs. Hamel's support payments.

## II.

Mrs. Hamel contends that the trial judge applied the incorrect standard in ter-

---

1. The trial judge also noted that Mr. Hamel has remarried and his new wife, who is unemployed, "has assisted [him] in his business ventures and along with [him] is responsible for raising [his] two children." *Id.* at 1946 n. 12.

2. The judge noted that

   > [a]lthough [Mrs. Hamel] testified she was delinquent in paying certain bills because she had not received her alimony payments, the Court ordered on March 13, 1986, that [Mr. Hamel] pay the arrearages ... [and] [w]ith

those funds, which the Court assumes have been paid, [Mrs. Hamel] should have been able to bring her accounts current and put some of the funds in savings for future use. Moreover the Court has thoroughly reviewed the evidence present regarding [Mrs. Hamel's] ability to provide for her financial needs and has concluded that she had the ability to independently do so.

114 Daily Wash.L.Rptr. at 1947 n. 19.

minating her support payments, or, alternatively, that he abused his discretion in applying the correct standard. She maintains that because the consent order adopted the parties' voluntary separation agreement, the trial judge should have required Mr. Hamel to meet a burden of proof that was the equivalent of that in *Cooper v. Cooper*, 472 A.2d 878 (D.C.1984), and not the equivalent of the burden in *Hamilton v. Hamilton*, 247 A.2d 421 (D.C.1968).[3] Alternatively, she maintains that the trial judge erred in failing to require that a modification of the level of support must give deference to the balance of equities established in the consent order.

The trial judge, referring to *Albus v. Albus*, 503 A.2d 1229 (D.C.1986), ruled that Mr. Hamel would have to show a material change in the circumstances of the parties in order to justify any modification of the support payments, applying the equivalent of the standard in *Hamilton, supra*, 247 A.2d 421 (modification of original order of child support allowed upon showing of material change in circumstances), and not that in *Cooper, supra*, 472 A.2d at 880, which held that child support payments set by a voluntary separation agreement incorporated but not merged into a divorce decree could be modified only if the party seeking modification could show (1) a change in circumstances which was unforeseen at the time the agreement was entered and (2) that the change is both substantial and material to the welfare and best interests of the children.

In *Albus, supra,* 503 A.2d at 1231, this court distinguished the situations in which the *Hamilton* and *Cooper* standards apply. If the court enters the original order of child support, then the *Hamilton* standard applies to requests for subsequent modification. But, if the support is paid pursuant to a voluntary separation agreement incorporated but not merged into the divorce decree, then the more restrictive *Cooper* standard applies. The rationale adopted by the court in *Cooper* for the more rigid standard in cases of voluntary separation agreements was that the *Cooper* standard assumes that the parties voluntarily agreed to be bound by the specific terms of the agreement. *Albus, supra,* 503 A.2d at 1231; *Cooper, supra,* 472 A.2d at 880. A further premise was that at the time of the separation agreement, the best interests of the children were a paramount consideration. *Albus, supra,* 503 A.2d at 1231.

Article III of the separation agreement/consent order provided that Mr. Hamel would make a monthly unitary payment of $3,200 for the support of Mrs. Hamel and their two children.[4] This para-

---

3. Mrs. Hamel's contention that the trial court lacked subject matter jurisdiction to terminate the support payments is meritless. *See Brown v. Dyer,* 489 A.2d 1081, 1083 & n. 1 (1985); *Grand v. Grand,* 163 A.2d 556, 557 (D.C.1960); *cf. Norris v. Norris,* 473 A.2d 380, 381 (D.C.1984). Her reliance on *Padgett v. Padgett,* 472 A.2d 849 (D.C.1984), is misplaced, for there the court held that a consent order is subject to enforcement like any other court order. *Id.* at 852. Moreover, Article VIII of the parties' separation agreement/consent decree expressly reserves to the D.C. Superior Court the power of subsequent modification. *See, e.g., Jones v. Jones,* 600 S.W.2d 36, 37 (Mo.App.1979) (property settlement made part of divorce decree is subject to modification of alimony where agreement clearly anticipated future alimony award); *Brister v. Brister,* 92 N.M. 711, 713, 594 P.2d 1167, 1169 (1979) (alimony award merged in decree subject to equitable modification even if agreement contains provision forbidding same except by consent of parties); *Wolfe v. Wolfe,* 46 Ohio St.2d 399, 419, 350 N.E.2d 413, 426 (1976) (power to modify support award implied in decree

even if decree based on agreement of parties); *Lee v. Lee,* 10 Ohio App.3d 113, 114, 460 N.E.2d 710, 712 (1983) (alimony award based on merged separation agreement subject to continuing modification regardless of decree's terms); *see also* H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 16.13, at 557 & n. 7 (1968) (separation agreement modifiable even when not made part of court decree if parties provide for modification in agreement) (hereinafter cited as CLARK). Mrs. Hamel's reliance on the doctrine of "reciprocal consideration" in North Carolina cases, *e.g., Bunn v. Bunn,* 262 N.C. 67, 70, 136 S.E.2d 240, 243 (1964), also is of no assistance to her in regard to the trial court's jurisdiction. *See, e.g., White v. White,* 296 N.C. 661, 665–67, 252 S.E.2d 698, 700–01 (1979).

4. Article III provides in pertinent part:
   *ALIMONY AND CHILD SUPPORT*
   A. The husband shall pay a sum of money monthly to the wife as combined alimony and the support and maintenance of the minor children of the parties, with a total of 12

graph also listed the circumstances which would necessitate a modification of support. Included were adjustments based on the consumer price index "in contemplation of Mr. Hamel's receiving increased future earnings," a percentage reduction upon the emancipation of each child, gainful employment by Mrs. Hamel, and the refusal of the taxing authorities to allow the deduction of Mr. Hamel's support payments. Article III further provided for the termination of spousal support if Mrs. Hamel remarried or had gross earnings in excess of a formula amount.[5] The consent order of 1976 did not change these provisions. Thereafter, when the trial judge ordered a change in custody of the two children from Mrs. Hamel to Mr. Hamel in 1982, Mr. Hamel's monthly support payments to Mrs. Hamel were reduced to approximately $1,440. In further accordance with the separation order, as a result of increases in the consumer price index, the level of support payments to Mrs. Hamel increased to $1,957.87 in July 1984 and to $2,030.21 one year later.

The instant case, thus, is not entirely analogous to either *Hamilton* or *Cooper*. Mrs. Hamel's support payments are not set pursuant to an original order of the court after hearing and fact-finding, *see, e.g., Tennyson v. Tennyson*, 381 A.2d 264 (D.C. 1977), but pursuant to a separation agreement incorporated and merged without modification into the consent order which includes a judgment of divorce. The separation agreement was a comprehensive settlement of the parties' rights and a division of their property. To this extent, the *Cooper* standard would appear more analogous than the *Hamilton* standard. However, the Hamels' separation agreement was merged, and not merely incorporated as in *Cooper*, in the consent order granting the

payments each year, commencing the first day of June 1976. The monthly payment for combined alimony and child support shall be $5,000 for the month of June 1976 and $3,200 per month thereafter.

1. In contemplation of the Husband's receiving increased future earnings, this Agreement specifically provides that effective on July 1, 1979, the monthly amount to be paid shall be increased or decreased by any cumulative percentage increase or decrease in the consumer price index of the Bureau of Labor Standards of the Department of Labor (the CPI) since the published index for the month of July 1976. Thereafter, beginning with the payment due on July 1, 1980, there shall be annual increases or decreases in the amount of the percentage increase or decrease of the CPI, effective on the first day of July of each succeeding year.

B. Notwithstanding the provisions of paragraph A of this Article III, the amount of the monthly payment to the wife shall be reduced upon the occurrence of any of the following events as to either child: death, emancipation by marriage or full-time employment, or by attaining the age of 21 years. If either child is a full time student, the provisions herein shall extend until he attains the age of twenty-two (22) unless he has been otherwise emancipated. Upon the occurrence of the first such event as to a child, the monthly payment shall be reduced by twenty-five percent (25%) of the amount then being paid; and upon the occurrence of such an event as to the other child, the amount of such reduction shall be fifty-five percent (55%) of the amount then being paid.

C. In the event the wife shall remarry subsequent to the execution of this Agreement, payments to the wife shall be in accordance with the following:

1. Monthly payments to the Wife for the support of the children shall be in the amount of $2,100 per month and shall be deemed child support only, and shall not be deductible by the Husband or taxable to the Wife, subject however to the cost of living increase set forth in paragraph 1 of paragraph A of Article III and subject to the reduction provisions of paragraph B of Article III.

5. Article III, Paragraph E provided:

E. In the event that the Wife secures gainful employment, there shall be a reduction of the Husband's obligation of payments to the wife as follows:

1. In the event that the Wife fails to have gross earnings in excess of $833 per month, there shall be no reduction of the Husband's obligation to the wife.

2. When the wife earns in excess of $833 per month, the Husband shall be entitled to a reduction of his monthly payment to the wife in an amount equal to one dollar ($1.00) for every two dollars ($2.00) in excess of $833 per month of gross earnings earned by the Wife.

3. In no event under this paragraph E shall payments to the Wife be less than $2,100 per month subject to the reduction provisions of this Agreement including paragraph 1 of paragraph A of Article III and paragraph B of Article III.

parties their divorce.[6] That is, the agreement was adopted by the court as its own determination of the proper disposition of the rights and property between the parties.

Traditionally, in this jurisdiction and others, the court can, upon a showing of changed circumstances, modify a separation agreement that becomes part of a court order and is therefore no longer in the nature of a contract between the parties. *See, e.g., Hamilton, supra,* 247 A.2d at 422–23; *Stevens v. Stevens,* 233 Md. 279, 281–82, 196 A.2d 447, 449 (1964); CLARK, *supra* note 3, § 16.12, at 554 & n. 3. As is readily apparent, however, these holdings are not inconsistent with either the rationale of *Cooper* or the theory underlying Mrs. Hamel's contention that *Cooper* is the correct standard. For although the court has the power to modify original orders setting the level of support, our cases have made clear that the extent of the court's power to modify is not without significant limitation.[7] At the time the Hamels entered into their separation agreement and the consent order was filed, the law in this jurisdiction did not contemplate that a motion to modify support presented the occasion for the trial court to reweigh the equities between the parties. The law remains

unchanged. In addition, at that time this court also explained what is meant by "a material change in circumstances."

In *Hamilton, supra,* decided four years before the Hamels' consent order, this court stated in considering an appeal from the denial of a motion to reduce the level of child support that

> in issuing an original support order, the trial judge may exercise a very broad discretion, which will not be disturbed except for an abuse of that discretion, but in thereafter modifying the order [the judge] is limited by the requirement that there must first be a showing of material change in the circumstances of the parties—a change which affects either the father's ability to pay or the needs of the minor children. Absent such a showing, the original decree is conclusive on the parties. Furthermore, the decree is not subject to modification as a procedural means of reviewing the equities of the prior decree.

247 A.2d at 422–23 (footnote omitted).

The court in *Hamilton* further acknowledged that the term "material change in circumstances" "is not easily definable," *id.* at 423, but nonetheless had no trouble rejecting four kinds of claims. Its analysis

---

**6.** Our prior decisions state that a merged agreement is subject to modification by the court whereas an incorporated agreement, while subject to modification, is modifiable to a far lesser extent and then only because of outstanding statutory requirements or court developed standards. *E.g., Clark v. Clark,* 535 A.2d 872, 875 (D.C.1987); *Norris v. Norris,* 473 A.2d 380, 381 (D.C.1984) (court has no power to modify separation agreement not merged with a divorce decree); *Cooper, supra,* 472 A.2d at 880; *cf. Brown v. Dyer, supra* note 3, 489 A.2d at 1083 (property settlement agreement incorporated into divorce decree is merely evidence of amount of child support to be paid, and not a contractual obligation between the parties). This is consistent with the understanding of the parties here, see note 7, *infra,* that their agreement was subject to modification by the court. *See Rogers v. Rogers,* 92 U.S.App.D.C. 97, 99, 203 F.2d 61, 63 (1953).

**7.** We do not read Article VIII of the separation agreement, reciting that the parties were advised by their separate counsel that their agreement was subject to court modification if merged into the consent order, as a waiver of the limitations on the court in modifying its

original order. At best the parties recitation is ambiguous. Given their comprehensive agreement, it hardly seems reasonable to conclude that by being advised of the court's power of modification the parties contemplated that their agreement, with its conditions and tradeoffs, would be ignored by the court in the future. Nor do we find reasonable Mr. Hamel's contention that as a result of the "in contemplation of future increases" language in Article III, (A)(1), see note 4, *supra,* Mrs. Hamel was risking that she might not receive any separate support if Mr. Hamel's income did not increase; under Paragraph III Mrs. Hamel was guaranteed a minimum amount of support except under specified circumstances, *see* Article III, Paragraph E, quoted in note 5 *supra,* and waived and released any rights and claims she might have under law, Article VII(A) and (B). Also, under Article III, Mrs. Hamel was not entitled to receive proportional increases in her support when Mr. Hamel's income increased, which he claimed was virtually certain and of which Mrs. Hamel and her attorney were advised prior to the filing of the consent order.

with regard to two such claims is particularly pertinent here.[8] In *Hamilton* the court rejected the husband's claim that a reduction of his child support payments was justified because of his remarriage and the imminent birth of a child from that marriage. The court stated that not only was the second marriage not a changed circumstance since it had occurred before the original order of support, but a "voluntary assumption of new obligations by marrying a second time does not excuse [the husband] from a prior obligation imposed by the court." *Id.* (citation omitted). Put another way, the context of the parties' original obligations to each other continues to be a controlling factor in examining claims of changed circumstances, and those obligations do not change as a result of voluntary actions by the party seeking relief. In addition, the court defined the phrase "voluntary assumption of obligation" very broadly. It rejected a requested reduction in support payments based on a diminution in the husband's monthly take-home pay as the result of "his required participation in a retirement plan instituted by his employer." The rationale was that this was "an investment in a future economic benefit [to the husband], a deferment in the ultimate realization of this portion of his salary to a later date, by which time the children will have obtained their majority and he will no longer be under a duty to support." *Id.* at 423.

The analysis in *Hamilton* is persuasive here, and we find no error by the trial judge in applying the equivalent standard in considering Mr. Hamel's motion to terminate his support of Mrs. Hamel. The obligation of child support is, admittedly, statutory, so that the level of child support can always be modified to assure compliance with the statute. *See Albus, supra,* 503 A.2d at 1231. However, the analysis in *Hamilton* did not depend on this fact, for no claim was made there that the needs of the children were not being met by the $350 monthly support originally set by court order. Accordingly, the existence of the statutory obligation of child support does not render any less relevant to adult support the *Hamilton* court's analysis of when the burden of showing a material change in circumstances is met. The use of an equivalent standard in the instant case is, moreover, fully consistent with our decisions on the nature of the obligation to pay alimony set by court order. *See Padgett, supra* note 3, 472 A.2d at 852.

### III.

Mrs. Hamel contends, alternatively, that the trial judge abused his discretion upon applying the *Hamilton* standard because in terminating her support, the judge improperly relied on the voluntary expenditures associated with Mr. Hamel's efforts to expose the allegedly illegal activities of Alaskan oil companies.

The burden was on Mr. Hamel to show a change of circumstances warranting the termination of his support payments to Mrs. Hamel. *Burnette v. Void,* 509 A.2d 606, 608 (D.C.1986); *Hamilton, supra,* 247 A.2d at 423; *Tuthill v. Tuthill,* 198 A.2d 905, 906 (D.C.1964). To meet this burden Mr. Hamel had to demonstrate "a material change in circumstances" as that phrase is defined in *Hamilton, supra,* 247 A.2d at

---

**8.** The court also rejected a claim that the level of support should be reduced because the parties' child no longer attended a private school. That expense was never intended to be included in the award to the child's mother, as it was not unforeseen at the time the agreement was entered. *Cf. Cooper, supra,* 472 A.2d at 880. The court then rejected a reduction based on certain "worthwhile" expenses for maintaining insurance policies. In the court's view, for the most part, the children of the husband's prior marriage are "merely contingent beneficiaries [under the policies], with the primary beneficiary his present wife," and such expenditures should not be allowed to the point that minor children are denied their right to reasonable support. *Hamilton, supra,* 247 A.2d at 423. The court also did not view with favor the idea that the children of the first marriage should bear the brunt of the husband's "straitened financial circumstances rather than to have the burden shared by all the offspring." *Id.* at 424. In considering the husband's ability to pay support, the court noted that Mr. Hamilton had not shown "a serious attempt to reduce expenses in other areas of his life." *Id.* (citing *Grand v. Grand,* 163 A.2d 556 (D.C.1960) (denial of reduction of support where there was a one-third actual reduction in husband's salary and no evidence of efforts to reduce expenditures)).

422–23. Since the court had determined in 1976 to adopt the Hamels' voluntary separation agreement as its own determination of what was fair and equitable between the parties, that decision was binding insofar as the equities were concerned in considering a motion to modify support payments. *Id.*

The trial judge's grant of Mr. Hamel's motion to terminate spousal support was based, however, on a reweighing of the equities. This is clear not only from the evidence on which the judge relied but from his reliance on *Tinney, supra,* 209 A.2d 927, in concluding that Mr. Hamel's spousal support obligation had become "unduly burdensome." *Tinney* involved an appeal from an original court order setting the level of support, and not from a motion to modify to which the limitations subsequently set forth in *Hamilton* would have been applicable. Since this court has not relaxed the *Hamilton* standards for motions to modify original court orders setting the level of support, the trial judge erred in concluding that because Mr. Hamel's expenditures associated with exposing the allegedly illegal activities of Alaskan oil companies were reasonable, and Mrs. Hamel had the capacity for earning greater income, Mr. Hamel was entitled to terminate all support to Mrs. Hamel.

This court has consistently held that a decrease in income due to the former husband's voluntary decision is insufficient to justify a reduction in support payments. *Freeman v. Freeman,* 397 A.2d 554, 556 (D.C.1979) (husband resigned from $24,000 per year job); *Tydings v. Tydings,* 349 A.2d 462, 464 (D.C.1975) (voluntary retirement); *Hamilton, supra,* 247 A.2d at 423 (husband's remarriage and second family). The record amply demonstrates that much of Mr. Hamel's present financial difficulty is the result of voluntary decisions that have proved very costly and have greatly diminished his ability to fulfill his obligation of providing continuing support to Mrs. Hamel. It further discloses that the trial judge failed to accord appropriate weight to Mr. Hamel's outstanding obligations to Mrs. Hamel under the consent order.

When the consent order was entered in 1976, Mr. Hamel was self-employed as a consultant and cargo broker in the ocean shipping business and was involved in the negotiation of oil leases in Alaska. His net income from this business endeavor was approximately $45,000. In 1978 or 1979, he acquired a limited partnership interest in Gulf M.B.H. Limited Partnership, and from this interest he realized a gross income of $1,300,000 over a three year period. Mr. Hamel estimated that his net income from this interest was in the hundreds of thousands. He testified that Mrs. Hamel and her attorney were advised prior to entry of the consent order that his income would greatly increase in the next years.

Late in 1979, Mr. Hamel entered the oil shipping business as a broker. He negotiated a contract between Earth Resources, an oil company, and Seatrain, the tanker owner of Pierce Tanker, for shipment of oil from Alaska. His commissions from this transaction amounted to approximately $100,000 per month from 1979 to 1981. During the contract period, a dispute arose, and Mr. Hamel alleged that the oil companies were shipping oil containing a high percentage of emulsified water. He further alleged that the bills of lading had been tampered with by employees of the Alyeska oil company. Earth Resources accused Mr. Hamel of taking sides with the ship owner (Seatrain) in the dispute and refused to renew its contract with Seatrain, for which Mr. Hamel served as broker. Despite the termination of the contract, Mr. Hamel continued to receive income from deferred fees and commissions under the expired contract and earned $346,000 in 1982 and $325,000 in 1983 as a result.

From the time of his discovery of the allegedly illegal activity concerning the watered-down oil, Mr. Hamel attempted to prove the complicity of the oil companies in connection with this affair. He testified in a large number of federal and state hearings called to investigate this activity. In addition, he personally intervened in the Alaska Public Utility Commission hearings in 1985 and filed complaints with the Environmental Protection Agency to try to

force the oil companies to comply with oil discharge permits at Port Valdez. Mr. Hamel has borrowed and spent thousands of dollars in connection with the investigation of the oil companies' activities. He faces no potential personal liability arising from the oil companies' activities.

In February, 1985, Mr. Hamel began reducing the amount of support he paid to Mrs. Hamel, and in July, 1985, he ceased payment altogether. During this time, he made no attempt to secure salaried employment but attempted to launch himself in the structured settlement business. Mr. Hamel testified that he has an understanding with J.M.W. Settlements, Inc. of Washington, D.C. under which he will receive fifty percent of the commissions on any business he brings to the firm. As of the date of the hearing, he had earned no commissions.

This evidence demonstrated clearly that Mr. Hamel had income-draining obligations which were, in significant part, voluntarily assumed. He faced no personal liability, and his counsel conceded at oral argument that Mr. Hamel had choices to make in deciding whether and to what extent to pursue the investigation of the oil companies. The record is replete with instances which demonstrate that Mr. Hamel's present financial difficulty is the result of purely voluntary decisions on his part that have proved extremely costly and have greatly diminished his ability to fulfill his court-ordered obligation of support of Mrs. Hamel.

Mr. Hamel's expenditures in his attempt to expose the alleged wrongdoings of the oil companies involved very substantial sums of money. He has, for example, personally paid for laboratory tests to be used in the F.B.I.'s investigation of the alleged incidents, employed attorneys for the purpose of pursuing these efforts, incurring over $100,000 in legal fees, and spent large amounts of money to pay for transportation, lodging, and meals to participate in hearings in Alaska. In addition to paying his own personal expenses for attending these hearings, Mr. Hamel undertook to defray the expenses of witnesses who also attended. In this regard, he went so far as to pay for the witnesses' travel to Anchorage, Alaska, and for their food and lodging while there. Mr. Hamel's telephone charges alone amount to approximately one thousand dollars per month, most spent in connection with the Alaskan oil companies affair. He has made all of these expenditures despite the fact that he himself will incur no liability from the incidents which are the subject of the investigations. Nor, according to his own testimony, and contrary to the trial judge's finding, does Mr. Hamel retain any hopes of reestablishing himself in the oil brokerage business.

The evidence also showed that Mr. Hamel continued to incur financial obligations in his attempts to pursue the structured settlement business. He has been involved in this pursuit since 1985, and has not attempted to obtain salaried employment, having restricted himself exclusively to his own personal business ventures. Despite this, he continues to employ a secretary at a salary of $15,000 per year, although he testified that because of his financial difficulties he has been unable to pay her for quite some time, maintains several business phone lines, including a WATS line, and incurs monthly office rent of $1,000.

The conclusion is inescapable that Mr. Hamel has spent very considerable sums of money and incurred substantial new obligations in pursuing the Alaskan oil affair and in attempting to start a new business. The long-standing rule in this jurisdiction is that a spouse who has support obligations cannot be allowed to squander all of his assets in pursuit of his own personal goals, however laudable they may be, and then request a termination of his support obligation because his attempts to achieve his private ends have exhausted his resources. Obviously, a trial judge properly could find that some expenditures associated with efforts to reestablish one's livelihood are reasonable. That, however, is not the point of Mr. Hamel's oil industry expenditures. Moreover, if Mr. Hamel had sought such reestablishment, his outstanding obligations under the consent decree would necessarily have placed a limitation on the extent of his expenditures. Although, as

the trial judge found, Mr. Hamel has made some efforts to reduce the expenditures associated with his life style, the record does not support the conclusion that he is financially unable to provide any support to Mrs. Hamel.

Furthermore, the trial judge's reliance on Mrs. Hamel's potential earning capacity cannot justify termination of all support for Mrs. Hamel. She introduced evidence of her present need.[9] Some of Mrs. Hamel's skills and employment experience existed prior to the consent order.[10] That her skills may improve or that she may obtain a higher paying job are immaterial to whether a material change in the circumstances of the parties has already occurred. *Cf. Sheridan v. Sheridan*, 202 A.2d 653, 655 (D.C.1964) (reversing original order of support denying alimony where wife is earning sufficient money to enable her to live); *DeSipio v. DeSipio*, 186 A.2d 624, 627 (D.C.1962) (reversing original order denying all separate maintenance where husband able to pay and wife's conduct adversely affected her ability to be gainfully employed).

By according evidentiary weight to expenditures which ignored Mr. Hamel's obligations under the consent order and to Mrs. Hamel's future earning power, the trial judge erred in concluding that Mr. Hamel had demonstrated "a material change in circumstances" under *Hamilton*, and therefore abused his discretion by re-

weighing the equities between the parties in granting Mr. Hamel's motion to terminate spousal support.

Accordingly, the judgment is reversed.[11]

---

9. The evidence showed that Mrs. Hamel's average monthly expenses as of February 26, 1986, were $2,828 for mortgages, condominium fees, utilities and repairs for her Tunlaw residence, food, insurance, and medical and other miscellaneous expenses. Her assets consist primarily of two condominiums that she purchased in 1980. She resides in one and rents the other for approximately $1,866 per year, which covers the maintenance expense; her equity in the property is approximately $56,000.

10. Mrs. Hamel is a citizen of Uruguay who has resided in the United States since 1960. She received a teaching degree in Uruguay and held teaching positions before coming to the United States. Since living here, Mrs. Hamel has held a variety of receptionist and clerical positions. After the birth of her first child in 1967, she ceased work and did not again seek employment outside the home until 1984. She has held

temporary positions as a substitute teacher in Maryland, and currently holds two part-time positions as a salesperson and hostess. Her gross income in 1985 was approximately $3,400.

11. Mrs. Hamel also appeals the denial of her request for attorney's fees incurred to collect support arrearages. Article VII of the separation agreement/consent order provides that if either party is found by the Superior Court to have violated the separation agreement, the court "may require the other party to pay" the actual expenses of counsel caused by the violation. In denying the request for fees, the trial judge relied on his finding that Mr. Hamel had not paid the arrearages because he had been financially unable to do so. In view of our holding that the trial judge abused his discretion in this regard, the underlying premise of the denial of attorney's fees is likewise flawed, and must be reversed.