**Brian P. DUFFY, Appellant,**

v.

**Joan Walsh DUFFY, Appellee.**

**No. 04–FM–197.**

District of Columbia Court of Appeals.

Argued June 28, 2005.
Decided Aug. 25, 2005.

David Schertler, Washington, DC, with whom Meredith A. Taylor, was on the brief, for appellant.

Anne Marie Jackson, Washington, DC, for appellee.

Before FARRELL and RUIZ, Associate Judges, and PRYOR, Senior Judge.

RUIZ, Associate Judge:

Appellant challenges the trial court's enforcement of the parties' separation agreement as part of its Judgment of Absolute Divorce. The trial court found that the agreement, which was contained in a letter signed by both parties, was complete and unambiguous on its face, and that the parties had demonstrated an intention to be bound by it. Consequently, the trial court found that the agreement is an enforceable contract, and required appellant to provide appellee with an accounting of the child support that was in arrears under the terms of the separation agreement, pay the outstanding amount within thirty days, and continue to pay child support in the amount provided for in the separation agreement. Finding no error in the trial court's judgment, we affirm.

## I.

The parties were married in Grand Rapids, Michigan on December 29, 1977. They adopted a daughter, born on September 19, 1995, who began residing with them on September 21, 1995. In 1998, appellant decided he wanted to separate from his wife. During their separation, the parties worked together to sell their marital home, divide the proceeds, pay their various debts, and distribute their personal property.

The parties also devoted considerable time and attention to resolving other issues of their divorce. At appellant's recommendation, they met with a lawyer who specialized in divorce mediation. They also met on their own on several occasions and had extensive discussions about their respective settlement concerns via e-mail.

In an effort to save time and attorney's fees, the parties negotiated an agreement on the terms of their divorce, which the appellee reduced to writing in the form of a letter addressed to her attorney, whom the parties agreed would then prepare a formal agreement incorporating the terms they agreed upon for review by appellant's lawyer. The letter dealt with a broad range of outstanding issues, including financial terms, child support, and the legal and physical custody of their daughter.

On May 12, 2001, both parties read over the letter drafted by appellee and signed it (hereinafter referred to as the "Letter").

Soon after, counsel for appellee prepared a Marital Settlement Agreement (hereinafter referred to as the "Draft Agreement") incorporating the terms set out in the Letter, and sent it to appellant on May 23, 2001.[1] Although appellant did not execute the Draft Agreement, the parties abided by the terms set out in the Letter from May 2001, when the Letter was signed, until November 2002, when appellant unilaterally reduced his child support payment from the $5000 per month provided for in the Letter, to $2000 per month.

Appellant filed a Complaint for Absolute Divorce, Custody and Related Relief with the Superior Court of the District of Columbia on February 11, 2002. Upon dismissal of his complaint by stipulation, he filed an Amended Complaint on December 27, 2002. With her answer, appellee simultaneously filed a Counter-Complaint for Absolute Divorce and Related Relief contending that in the Letter the parties had resolved all issues remaining from the marriage. At trial, appellant testified that his main point of contention was the amount of child support set out in the Letter ($5000 per month), and that he challenged the enforceability of the Letter as an agreement primarily in order to have the court reach an independent judgment as to the appropriate amount of child support, which he proposed should be $2000 per month—the amount to which he had reduced his monthly support payment in November 2002. The trial court determined, however, that the Letter is an enforceable contract, and in the order granting appellant's complaint for divorce, ordered past and ongoing child support to be paid in the amount specified in the Letter.

**II.**

The law in this jurisdiction encourages the use of separation agreements to settle the financial affairs of spouses who intend to divorce. *See Bracey v. Bracey,* 589 A.2d 415, 416 (D.C.1991); *see also Lanahan v. Nevius,* 317 A.2d 521, 523 (D.C.1974). This policy is based on the notion that the parties are in a better position than the court to determine what is fair and reasonable in their circumstances. *See Le Bert–Francis v. Le Bert–Francis,* 194 A.2d 662, 664 (D.C.1963). In the absence of fraud, duress, concealment or overreaching, a separation agreement is presumptively valid and binding no matter how ill-advised a party may have been in executing it. *See Reynolds v. Reynolds,* 415 A.2d 535, 537 (D.C.1980); *see also Le Bert–Francis,* 194 A.2d at 664 (ruling that a rebuttable presumption of validity exists where an agreement is fair on its face).

A separation agreement is a contract, subject to the same law governing other contracts. *See Owen v. Owen,* 427 A.2d 933, 937 (D.C.1981); *see also Lanahan,* 317 A.2d at 524. "For there to be an enforceable contract, there must be mutual assent of the parties to all the essential terms of the contract." *Malone v. Saxony Coop. Apartments,* 763 A.2d 725, 729 (D.C. 2000); *cf. Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1238 (D.C.1995) (an oral agreement, reached ahead of a written contract, lacked many important

---

1. It appears that appellant was not represented by counsel at the time. In her letter to appellant enclosing the Draft Agreement, appellee's counsel advised appellant that she did not represent him and that he had a right to be represented by an attorney and should consult one if he had any questions or concerns about the Draft Agreement she had prepared.

details contained in the written version, and therefore was not enforceable). In order to prove the existence of an enforceable contract, therefore, there must be "(1) an agreement to all material terms, and (2) intention of the parties to be bound." *Id.*; *see also Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). This court reviews the trial court's legal conclusion that a contract is enforceable *de novo*, but the trial court's subsidiary factual findings are treated as "presumptively correct unless they are clearly erroneous or unsupported by the record." *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C.2000) (quoting *Auxier v. Kraisel*, 466 A.2d 416, 418 (D.C.1983)); *see* D.C.Code § 17–305(a) (2001); *see also Spencer v. Spencer*, 494 A.2d 1279, 1286 (D.C.1985) (ruling that where the trial court has resolved factual disputes regarding a contract between the parties, this court must treat those factual findings as presumptively correct unless they are clearly erroneous or unsupported by the record).

*A. Agreement to all material terms*

■ In order for a contract to be enforceable, it "must be sufficiently definite as to its material terms (which include, *e.g.*, subject matter, … payment terms, quantity, and duration) that the promises and performance to be rendered by each party are reasonably certain." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 327 (D.C.2001) (quoting *Rosenthal v. National Produce Co.*, 573 A.2d 365, 370 (D.C.1990) and citing *Georgetown Entm't Corp.*, 496 A.2d at 590). Conversely, an agreement is unenforceable if it fails to address material terms. In *Stansel v. American Security Bank*, 547 A.2d 990, 993 (D.C.1988), *cert. denied*, 490 U.S. 1021, 109 S.Ct. 1746, 104 L.Ed.2d 183 (1989), we rejected a claim that an oral agreement concerning a loan

was enforceable, because the parties failed to "offer[ ] evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance." We accordingly held that "the claim of breach of contract fail[ed] for lack of certainty of the contract's terms." *Id.*; *see also Owen*, 427 A.2d at 938 (noting that, to be final, a contract must include all the terms the parties intend to cover). If all material terms are addressed, however, and "the terms of the contract are clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy, it is enforceable." *Affordable Elegance Travel*, 774 A.2d at 327 (citing *Rosenthal*, 573 A.2d at 370).

■ We agree with the trial court that the Letter was both complete and definite with regard to the terms of the parties' dissolution of their marriage. According to the Letter:

> Brian [appellant] and I [appellee] have agreed upon the basic terms of the divorce settlement, as we understand them in lay terms. The key items are outlined below. We would like your help to create a document that expresses these intentions as well as any other items that need to be included in such a document. It is our intent to then forward the document to Brian's lawyer for review.

The language of the Letter therefore shows that the parties understood themselves to have "agreed upon the basic terms of the divorce settlement." This understanding is borne out by the terms covered in the Letter, which memorialized the parties' agreement on thirteen separately listed items: joint legal custody of their daughter, with appellee as the custodial parent; vacation and visitation rights and costs; division of proceeds from the

sale of their home; ownership of appellant's life insurance policy; transfer of funds from appellant's 401K account; health insurance coverage for their daughter; sharing of costs of their daughter's education and wedding; the absence of any restrictions on the parties' future place of residence; [2] the absence of marital debt; and child support at the rate of $5000 per month.[3] The child support—as to which appellant has expressed primary concern—was clearly articulated in its own clause, and was specific as to amount, manner of payment, and duration.[4] Thus, the parties could be clear about their obligations and expectations, and, in the event of a challenge, a trial court would be able to determine whether there had been a breach of the child support agreement and to fashion an appropriate remedy. *See Affordable Elegance Travel*, 774 A.2d at 327.

In support of his argument that the Letter does not evidence a meeting of minds on all material terms, appellant asserts that it lacked a regular visitation schedule for him to see his daughter, or agreement regarding the division of their personal property ("furniture and what-

not"). But the Letter did address "vacation and visitation" with his daughter,[5] and contained a provision specifying the division of the proceeds from the sale of their house. Although the Letter did not provide for the division of personal property, testimony at trial demonstrated that the parties had divided the household furniture and other personal property *prior* to the signing of the Letter. Viewed in the context of the parties' previous dealings, the Letter therefore disposed of all remaining marital property, real and personal, and arranged for the child's custody, visitation, and support, including monthly child support, ongoing health insurance, college and wedding costs. Since there was no material issue left undisposed and the terms were clear, the Letter was sufficiently complete to be enforceable. *See, e.g., Spires v. Spires*, 743 A.2d 186, 190 (D.C. 1999) (holding that agreements between parties settling all property rights and claims are enforceable, as are agreements arranging for child custody and monthly support payments, provided they are in the best interest of the child) (internal citations and quotations omitted); *Davis v. Davis*, 268 A.2d 515, 517 (D.C.1970) (enforcing a separation agreement that pro-

2.  E-mail communications between the parties also demonstrate that both parties understood their agreement included no restrictions on residence.

3.  While the Letter includes a significant amount of child support, it does not provide for alimony. Alimony, however, is not a necessary element of a divorce settlement, and neither party contends entitlement to alimony.

4.  The Letter reads as follows on the subject of child support:

    Brian agrees to pay child support to Joan until [their daughter] reaches the age of 18. Brian will deposit $5,000.00 per month (beginning September 1, 2001) into Joan's checking account. This child support will be non-taxable to Joan or Brian. Joan

would also like a clause that states that amount will be adjusted annually to reflect the then current Consumer Price Index.

5.  The Letter provides in this respect:

    Vacation and visitation to be arranged as follows:
    -Brian may have [daughter] for three weeks during her summer vacation.
    -Joan and Brian shall each have [daughter] for major holidays (Christmas, New Years, Thanksgiving, Easter) in alternating years.
    -All other details and considerations to be handled on a mutually agreed basis.
    With respect to visitation, the Letter states: Joan shall provide accommodations and transportation for Brian while he is visiting [their daughter] and two hundred and fifty dollars for each of his monthly trips to visit [her].

vided for the division of all of the marital property, temporary alimony, child custody and child support).

We disagree with appellant's contention that a comparison of the terms of the Letter and the Draft Agreement prepared by appellee's lawyer shows that the Letter was incomplete. The minor differences in language between the Letter and the Draft Agreement do not go to the substance of the agreement, and merely further specify foreseeable details.[6] Appellant does not explain how the expense items listed in the Draft Agreement are materially distinct from the Letter's more general terms, "undergraduate college education" and "wedding," nor does he contend that those more general terms are so vague as to preclude the parties from reasonably knowing how to perform their obligations under the Letter.

The Draft Agreement also added provisions for attorney fee shifting in the event of breach or default by either party, and for the payment of their daughter's unreimbursed medical expenses. Terms providing for how parties will allocate attorney's fees incurred in seeking redress for a breach of contract are not necessary for the parties to understand how they are expected to perform the contract itself. *See Hackney v. Morelite Constr., D.C. Corp.*, 418 A.2d 1062, 1068 (D.C.1980) (noting that absence of agreement on incidental factors—who will bear closing costs and transfer taxes—does not render an agreement on material terms to sell property unenforceable). Moreover, given that the parties reached detailed agreement on child support and health insurance,[7] the absence of a provision on unreimbursed medical expenses is unremarkable.[8]

The record supports the trial court's finding that the Letter was "intended to be the complete and final agreement between the parties," and that it is "clear on its face."

## B. Intent to be bound

■ For an enforceable contract to exist, the court must not only determine that there was an agreement to all material terms, but also that the parties intended to

---

**6.** For example, the Letter provides that the parties "will each bear half the cost of [their daughter's] undergraduate college education and her wedding expenses." With respect to college education, the Draft Agreement states that "[t]he parties shall each be responsible for fifty percent (50%) of the costs of SATs, SAT tutoring, pre-application college visits, reasonable travel to and from school, tuition, room and board, books, registration and ancillary fees, and reasonable application fees incident to providing [their daughter] with a four year undergraduate college education." And with respect to a future wedding, "[t]he parties shall each be responsible for fifty percent (50%) of the costs associated with [their daughter's] wedding and reception."

**7.** With respect to health insurance, the Letter provides:
> Brian will provide customary health coverage; including major medical, health, dental and vision coverage for [his daughter]. Joan will pay the annual deductible

up to $500. Brian will modify his policy to reflect an annual deductible ... of $500 rather than the current $1000.

**8.** In his brief, appellant makes the related argument that the differences between the Letter and Draft Agreement indicate that the Letter was merely an "agreement to agree." Appellant seems to have abandoned this theory at oral argument. As noted in the text, none of the additional elements introduced in the Draft Agreement was significantly different or necessary for the performance of the terms memorialized in the Letter. Thus, they were not material, and did not undermine the binding nature of the agreement memorialized in the Letter. *Cf. D.C. Area Cmty. Council, Inc. v. Jackson*, 385 A.2d 185, 187 (D.C. 1978) (holding that if the final contract the parties agree to make contains any material terms not already agreed on, no contract has yet been made).

be bound. *See Jack Baker, Inc.*, 664 A.2d at 1238 (citations omitted). The intentions of parties to a contract can be found from written materials, oral expressions and the actions of the parties. *See Davis v. Winfield*, 664 A.2d 836, 838 (D.C.1995) (holding that failure to sign a copy of a lease was not determinative of the validity of the existence of a contract; the conduct of the parties should also be taken into account); *see also Bergman v. Parker*, 216 A.2d 581, 583 (D.C.1966) (holding that evidence introduced at trial established that appellant intended to enter into a contract for construction of a low-cost apartment building by submitting to appellees five sets of plans which formed the foundation for the ultimate contract price).

■ Both appellant and appellee signed the Letter, the clearest evidence of mutual assent to the terms of the document. *See Davis v. Winfield*, 664 A.2d at 838. ("Mutual assent to a contract, often referred to as a 'meeting of the minds,' is most clearly evidenced by the terms of a signed written agreement . . . ."). Moreover, appellant's actions demonstrated his intent to be bound by the terms set forth in the Letter because for the following year and a half he abided by them: appellee was the child's custodial parent; appellant transferred his life insurance policy to appellee as agreed; the parties followed the Letter's visitation schedule for major holidays; appellant continued to provide his daughter with health insurance through his own policy; and appellant paid the amount of child support ($5000 per month) as set out in the Letter for nearly

fifteen months, until he unilaterally reduced his child support payment to $2000 per month on November 1, 2002.[9] Based on this evidence, the trial court found that appellant had manifested an intention to be bound by the terms in the Letter.[10]

Appellant argues that the trial court overlooked that the Letter also demonstrated his intention to have his attorney review the final document,[11] and that such review therefore constituted a condition precedent to enforcement of the settlement agreement. Whatever ambiguities may be inherent in the provision for the lawyer's "review," the Letter unambiguously states that the parties "have agreed upon the basic terms of the divorce settlement," expressing a meeting of the minds with respect to the terms of the agreement. *See Owen*, 427 A.2d at 938. The relatively minor role of the lawyer's anticipated review is confirmed by an e-mail to appellee during the negotiations leading up to the Letter, in which appellant wrote:

> I would be agreeable to having your attorney's assistant draw up the appropriate legal papers, and not have to pay Cam [a mediator] any more money (and make another trip to Rockville). I would then simply have my lawyer review the paperwork and tell him that the papers reflect what you and I have decided to do.

In taking steps to immediately abide by the terms of the Letter he signed, after having stated that he only wanted a lawyer to ensure that "the papers reflect what you and I have decided to do," appellant demonstrated that the review he contemplated

**9.** Appellant had begun paying child support in the agreed-upon amount on July 31, 2001, though the Letter stipulated that payment would begin on September 1, 2001.

**10.** The trial court noted that appellant had not transferred funds to appellee from his 401K account as provided in the Letter. She

also noted, however, that the trial court's order would be necessary to effect the transfer.

**11.** The Letter states that "[i]t is our intent to then forward the document to Brian's lawyer for review."

by his attorney was merely for the purpose of ensuring that the language of the final document would embody the terms to which he agreed in the Letter, and not to reconsider those terms. Thus, the record supports the trial court's finding that the parties intended to be bound by the Letter. Based on this finding and the trial court's finding that the Letter covered the material terms of the parties' divorce settlement, we agree with the trial court's conclusion that the Letter is an enforceable agreement.

### III.

During trial and on appeal appellant has expressed concern that the Letter does not address what would happen to his child support obligation in the event he lost his job, or had other financial constraints. Although provision for future contingencies could well have been part of the parties' agreement,[12] it is not a necessary component for enforceability because, to be complete, a contract need only be sufficiently definite so that the parties can be reasonably certain as to how they are to perform. *See Affordable Elegance Travel,* 774 A.2d at 327. However, even without an express provision in the Letter for modification of child support to take into account changes in appellant's financial situation, appellant would not be precluded from seeking relief from the court should a change in his circumstances adversely affect his ability to pay child support.

The standard for granting a modification to child support specified in a settlement agreement depends on whether the agreement was merged into the court's judgment, or incorporated by reference. The trial court has limited authority to alter a child support provision in a separation agreement that is incorporated, but not merged, into an order of divorce, due to the "presumption that 'a child support agreement negotiated between two parents is adequate to meet the child's foreseeable needs, and that at the time of the agreement the best interests of the child were a paramount consideration.'" *Clark v. Clark,* 638 A.2d 667, 669 (D.C.1994) (quoting *Dershowitz v. Doctors,* 585 A.2d 174, 175 (D.C.1991) (citation and internal quotation marks omitted)). A trial court may modify such an agreement only upon a showing of "(1) a change in circumstances which was unforeseen at the time the agreement was entered and (2) that the change is both substantial and material to the welfare and best interests of the children." *Cooper v. Cooper,* 472 A.2d 878, 880 (D.C.1984) (citations omitted) (holding that the aforementioned standard is required to modify support payments set in an agreement incorporated but not merged in a divorce decree); *see also Foster–Gross v. Puente,* 656 A.2d 733, 737 (D.C.1995) (citing *id.*); *Dershowitz,* 585 A.2d at 175–76 (applying the *Cooper* standard to a request for modification of a support agreement that was neither incorporated nor merged in the divorce decree); *Albus v. Albus,* 503 A.2d 1229, 1232 (D.C.1986). "However, a change in the parents' financial circumstances alone 'cannot provide the basis for modifying a contract between the parties.'" *Cooper,* 472 A.2d at 881 (quoting *Lanahan,* 317 A.2d at 524). As a result, a trial court may *increase* a child support payment provided in a settlement agreement if there arises an unforeseen change in circumstances that is substantial and material to the interests of the child, but it may not *decrease* such a child sup-

---

12. We note, for example, that the Letter states that "Joan would also like a clause that states that amount [of child support] will be adjusted annually to reflect the then current Consumer Price Index." This statement reflects that although some contingencies were considered, the parties did not incorporate them in their agreement.

port agreement simply because the payor's financial circumstances have declined, or the child support payment subsequently proves to exceed the child's needs.

Thus while a court may find that a child support agreement does not provide a sufficient amount of money to meet a party's legal obligation to support and may order a larger sum to be paid . . . it may not modify such an agreement by reducing the agreed upon amount to the minimum the law would impose in the absence of an agreement, or to any sum different from that provided for in the agreement.

*Lanahan,* 317 A.2d at 525 (citing *Blumenthal v. Blumenthal,* 155 A.2d 525, 526–27 (D.C.1959)). In order to have the court reduce the child support provided in a settlement agreement incorporated by the court, a payor would therefore have to avail himself of a contract theory that would relieve him of the burden of such performance, *e.g.,* contract defenses such as "fraud, duress, concealment, or over-reaching," *Davis v. Davis,* 268 A.2d at 517, or "frustration of performance" either due to "strict impossibility," or "impracticability due to extreme or unreasonable difficulty or expense." *Whelan v. Griffith Consumers Co.,* 170 A.2d 229, 230 (D.C.1961) (citing RESTATEMENT OF CONTRACTS § 454 (1932); IV CORBIN, CONTRACTS § 1325 (1951)); *see* RESTATEMENT (SECOND) OF CONTRACTS § 261 (1979) ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary"). Thus, if the appellant were to become unexpectedly disabled and, as a result, his finances suffered significantly, the court could reduce or excuse the child support obligation only if it were

impossible or impracticable for appellant to make child support payments at the stipulated amount.

■ Where a settlement agreement is merged into the trial court's order, on the other hand, the binding force of the amount of child support is not based on the contractual obligation arising from an agreement between the parties, but on the authority of the court's order. *See Hamel v. Hamel,* 539 A.2d 195, 197 (D.C.1988). The court's order is guided by the child support guidelines established by statute. *See* D.C.Code § 16–916.01 (2001). Consequently, where a settlement agreement on child support is merged into the court's order, the court has discretion to modify its own order based on a showing by either party of a material change in the circumstances of either the child or the parents. *See Hamel,* 539 A.2d at 199 (citing *Hamilton v. Hamilton,* 247 A.2d 421, 422–23 (D.C.1968) (other citations omitted)). A parent seeking relief from an onerous child support payment need then only show a "substantial or material change of circumstances," that would support a significantly different amount of child support under the guidelines. D.C.Code § 16–916.01(*o*)(3) (establishing presumption that modification is warranted if current circumstances would vary child support "by 15% or more" under the guidelines).

■ A settlement agreement is merged, and not merely incorporated into a court order, where "the agreement was adopted by the court as its own determination of the proper disposition of the rights and property between the parties." *Hamel,* 539 A.2d at 199. The trial court's order in this case did not make an independent assessment of the needs of the child, but only determined the enforceability of the terms contained in the Letter. The Letter, for its part, did not specify

how the parties wanted the court to treat their agreement in the order granting the divorce. We note, however, that in ordering that "[t]he plaintiff shall pay child support in accordance with the May 12, 2001 letter agreement," the court also required that the amount of child support be "adjusted in accordance with the consumer price index," an adjustment that had not been agreed to in the Letter. See *supra* note 12. Thus, there is a question whether the trial court in this case merged the settlement agreement into its order, or incorporated it by reference.

Though other jurisdictions have enunciated criteria for determining whether a settlement agreement has been merged or incorporated into an order of divorce, *see, e.g., Johnston v. Johnston,* 297 Md. 48, 465 A.2d 436, 439–440 (1983), we have not had occasion to do so thus far. Nor do we need to decide it at the present juncture in this case, as appellant is not presently claiming a change in circumstances as a basis for modification. We note, moreover, appellee's concession in her brief and at oral argument that the standard for merged agreements would apply in this case were appellant to claim at some future date that changes in his employment situation, income, or other responsibilities require modification of his child support obligation under the trial court's order.[13] Although the trial court would not necessarily be bound by the parties' interpretation of its order, their agreement on the standard for modification of child support would be an important, if not definitive, consideration.

The record in this case shows a serious, sustained effort by mature adults seeking to come to a reasonable agreement about their property and, most important, their continuing responsibility to and relationship with their child. Appellant may now regret that he entered into an agreement without first seeking the advice of counsel, or he may think, after the passage of time, that he should not have agreed to the terms contained in the Letter. These doubts do not negate that the Letter is complete as to the essential terms of the parties' divorce, and that appellant's course of conduct for over a year—from signing the Letter, to abiding by its terms, to stating in his e-mail communications his desire that any formalized agreement incorporate the terms in the Letter—demonstrates his intent to be bound by the conditions set forth in that agreement.

For the foregoing reasons the trial court's Judgment of Absolute Divorce enforcing the terms of the separation agreement is

*Affirmed.*

---

13. Contrary to appellee's representations on appeal, the Draft Agreement prepared by appellee's counsel provided that it would not be merged into the court's order, and the appellee's counter-complaint similarly requested that the Letter be incorporated, but not merged, into the judgment of divorce.