Myles SPIRES, Jr., Appellant

v.

Yvonne A. SPIRES, Appellee.

No. 96–FM–1127.

District of Columbia Court of Appeals.

Argued Nov. 18, 1998.
Decided Dec. 23, 1999.

Myles Spires, Jr., pro se.

Yvonne A. Spires, pro se.

Before WAGNER, Chief Judge, and TERRY and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Myles Spires, Jr., appeals from an order awarding appellee Yvonne Spires custody of their three minor children. Mr. Spires maintains that the trial court abused its discretion in failing to enforce provisions of marital and separation agreements which provided that he be awarded sole custody of the children and have complete power to determine Mrs. Spires' visitation rights. We hold that because those portions of the agreements are unenforceable in the District of Columbia, the trial court correctly disregarded them and based its decisions on custody and visitation solely on the best interests of the children. We also reject appellant's contention that the trial court erred in failing to give adequate consideration to the relationship between the children and their half-brother. Finding no error in the record before us, we affirm.[1]

---

1. Mrs. Spires asks this court to modify the provisions of the trial court's order granting liberal visitation privileges to Mr. Spires. She does not claim that the trial court abused its discretion, but rather asserts that "new evidence" warrants a modification of the or-der. Whatever the merits of this claim, it must be presented initially to the trial court, which retains continuing jurisdiction over such matters. See D.C.Code §§ 16–911(a–2)(4)(A) and 16–914(a)(2) (1997).

I

Myles and Yvonne Spires were married on October 27, 1984. The marriage produced three children: Myles III, born August 1, 1985; Lorenzo, born October 16, 1986; and Paul, born August 22, 1989. Delanta Spires, Mr. Spires' son from a previous relationship, also lived in the marital home. Sometime around 1990 the marital relationship began to deteriorate because of financial disputes and mutual suspicions of infidelity. On September 23, 1991, following a three-day separation, the parties signed a document described as a "marital agreement," in which Mr. Spires promised to remain married to Mrs. Spires as long as she complied with thirteen "Articles of Continuance." [2] In the event of a divorce, seven "Articles of Dissolution" would control. These articles provided, in part, that neither party would pay any child support or alimony, and that Mr. Spires would have sole custody of the children with absolute power to determine Mrs. Spires' visitation rights.

On March 22, 1994, Mrs. Spires left the marital home. That same day, she drafted a handwritten letter declaring her intent to dissolve the marriage, granting Mr. Spires "sole proprietorship" of all real property, retaining to herself only selected articles of clothing "and other miscellaneous items," and relinquishing "all custody and parental rights and authority . . . ." The letter concluded with a statement that it was "mastered [sic] devoid of undue du-

ress" and that Mrs. Spires "only desire[d] to pursue a new and different life alone."

Several months later, Mr. Spires filed a complaint seeking a divorce and permanent custody of the children. Mrs. Spires filed an answer and counterclaim, also seeking a decree of divorce, custody of the children, child support, equitable distribution of personal property, and an equitable interest in a Maryland home which Mr. Spires co-owned with his alleged mistress. A few days later, Mr. Spires filed a motion to enforce the marital and separation agreements. Mrs. Spires filed an opposition, claiming that the agreements were signed without full disclosure of Mr. Spires' interest in the Maryland property. [3]

The case went to trial before a judge of the Superior Court, and upon its conclusion the judge awarded interim custody of the children to Mrs. Spires. The judge ruled that a final determination would be made after the completion of a home study by the Family Branch of the court's Social Services Division and psychological testing conducted by Washington Assessment and Therapy Services ("WATS").

Joyce Bradford, a court probation officer, performed the home study. In her evaluative summary, Ms. Bradford recommended that custody of the three children be awarded to Mrs. Spires. Although Mr. Spires presented the reports of two other therapists which contained claims of child abuse made against Mrs. Spires by Delanta, Ms. Bradford found the allegations unfounded, malicious, motivated by a desire

2. The Articles of Continuance state, among other things, that Mrs. Spires may not withdraw any money from the bank without Mr. Spires' express permission; may not "attempt to influence the status/intensity" of any relationship that Mr. Spires may have "with other individuals outside of the marriage unless the husband verbally requests input from the wife"; may not "dispute" Mr. Spires in public "on any matter"; must "conduct herself in accordance with all scriptures in the Holy Bible applicable to marital relationships germane to wives and in accordance with the husband's specific requests"; must maintain a sexual relationship that "remains spontaneous and solely with the husband"; must "car-

ry out requests of the husband in strict accordance, i.e., timeliness, sequence, scheduling, etc."; and may not receive any loan or gift without first obtaining Mr. Spires' permission. According to the agreement, violation of any of these articles would be considered mental cruelty, abandonment of the marriage, and a request for legal separation and divorce.

3. The trial court ultimately found that this property had not been purchased or maintained with Mr. Spires' funds and therefore was not marital property. That finding is not challenged on appeal.

to defame Mrs. Spires, and deliberately concocted to influence the court proceedings. In her testimony at a hearing on November 15, 1995, Ms. Bradford stated that the child abuse allegations were not supported by her interviews with the children and their teachers at Gibbs Elementary School. She found it highly unlikely, given Delanta's prior history of abuse (by his biological mother), that he would be able to mask the abuse described in the therapists' reports. Ms. Bradford further stated that Delanta's "overall demeanor" indicated to her that he was merely "reciting information that had been given to him" by someone else. None of the other children mentioned any incidents of abuse involving Mrs. Spires. On the basis of her investigation, Ms. Bradford opined that "the children [were] being given negative information in order to legitimize Mr. Spires' individual claims."

The wishes of the children were inconclusive. Myles III said that he wanted to live with his father, Paul preferred living with his mother, and Lorenzo did not state a preference. Ms. Bradford testified that the children were "bonded" and had a very close relationship with their half-brother Delanta. According to Ms. Bradford, the best solution to the custody issue would be a joint custody arrangement, but the relationship between the parents made such an arrangement unfeasible.

The court in due course entered findings of fact, conclusions of law, and a judgment of absolute divorce. With respect to custody, the court found that Mrs. Spires had been the primary caretaker for most of the children's lives; that she had left the family home in March 1994 because she believed that was the only way to free herself from Mr. Spires' control and domination; that Mrs. Spires never intended to abandon the children, and in fact attempted to have them join her as quickly as possible; that Mrs. Spires had steady employment and had maintained a stable and appropriate home for the children, attending to their physical, educational, and emotional needs; and that the children were comfortable with Mrs. Spires in the home she had created. In contrast, the court found that Mr. Spires "has not been completely candid with the court regarding his living situation, his relationship with [his alleged mistress], and several other matters," including his sources of income, and that Mr. Spires had spoken negatively about Mrs. Spires to the children in an attempt to undermine her, a factor which the court considered "of great significance in making a custody determination in this case."

The court's findings were based on its own interviews with the children, the psychological assessment by WATS, the home study evaluation, and Ms. Bradford's testimony at the hearing, which the court found "very credible and insightful." The court concluded that the children's best interests would be served by awarding Mrs. Spires permanent custody while granting liberal visitation privileges to Mr. Spires, consistent with Ms. Bradford's recommendation. Additionally, Delanta was permitted to visit the other children at Mrs. Spires' home.

## II

■ As a general rule, separation agreements determining property rights are to be encouraged, and their provisions are enforceable in court. *Lanahan v. Nevius*, 317 A.2d 521, 524 (D.C.1974); *Doerfler v. Doerfler*, 196 A.2d 90, 91 (D.C.1963). "In the absence of fraud, duress, concealment, or overreaching, a husband and wife may enter into a valid separation agreement which finally settles all property rights and claims between them, and constitutes a bar to further claims by the wife." *Davis v. Davis*, 268 A.2d 515, 517 (D.C.1970) (citations omitted). Agreements regarding the custody of children, however, are another matter entirely.[4]

---

4. This appeal involves only those provisions of the marital and separation agreements relating to custody and visitation rights. In her findings of fact, the trial judge noted that

■ In the District of Columbia, parents "may use a separation agreement to establish child custody and visitation rights ...." *Portlock v. Portlock,* 518 A.2d 116, 118 (D.C.1986). Generally, such agreements are enforceable, like property settlements, "in the absence of fraud, duress, concealment or overreaching." *Id.* (citing *Cooper v. Cooper,* 472 A.2d 878, 880 (D.C. 1984)); *see also Rice v. Rice,* 415 A.2d 1378, 1382 (D.C.1980). However, the court has the authority to modify custody arrangements agreed upon by the parties if it is in the best interests of the children to do so. *Owen v. Owen,* 427 A.2d 933, 938 (D.C.1981); *Rice,* 415 A.2d at 1383. The determination of the children's best interests, which is always "the controlling consideration," is "entrusted to the sound discretion of the trial court." *Owen,* 427 A.2d at 938; *accord, e.g., Utley v. Utley,* 364 A.2d 1167, 1170 (D.C.1976); *Willcher v. Willcher,* 294 A.2d 486, 487 (D.C.1972) (expressly recognizing that "the best interest of a child takes precedence over any agreement executed by its parents"). To the same effect is *Emrich v. McNeil,* 75 U.S.App.D.C. 307, 310, 126 F.2d 841, 844 (1942): "After submitting themselves to the jurisdiction of the court, the parents cannot by their agreement deprive it of power to control the custody and maintenance of the child. Such a child is in a very real sense the ward of the court. It has power to change the custody of the child ...."

■ In light of *Owen* and other controlling case law, we hold that the provisions in the marital and separation agreements upon which Mr. Spires relies could not deprive the court of the power to determine whether the parties' custody arrangement was in the best interests of the

children. The trial court thus properly considered whether the custody provisions in the agreements were consistent with those interests. On the record before us, we conclude that the court did not err in ruling that those provisions were contrary to the children's best interests and in deciding to award custody to Mrs. Spires.

### III

■ Mr. Spires also contends that the trial court abused its discretion in awarding custody of the three children to Mrs. Spires without giving adequate consideration to the relationship between the children and their half-brother, Delanta, as required by statute.[5] This contention is not supported by the record.

Mr. Spires correctly notes that, despite the court's instructions, the home study did not address the relationship between the children and Delanta. At the November 15 hearing, however, Ms. Bradford testified that the children were "bonded" and had a very close relationship with Delanta. Furthermore, the court's final order included a provision for Delanta to visit the children at Mrs. Spires' home, reflecting the court's concern for maintaining and nurturing this relationship. Mr. Spires' claim that the trial court did not consider this factor is thus without merit.

■ In any dispute between parents over the custody of minor children, the primary consideration is the best interests of the children. *Bazemore v. Davis,* 394 A.2d 1377 (D.C.1978) (en banc). Because of the "intensely individual nature of custody determinations," we accord those decisions "great deference" and will reverse only upon a showing of a clear abuse of discretion. *Prost v. Greene,* 652 A.2d

---

"[t]he parties have resolved for themselves any issues regarding personal property acquired during the marriage," and observed that the question of support was the subject of a pending proceeding in Maryland.

**5.** D.C.Code §§ 16–911(a)(5)(C) and 16–914(a)(3)(C) both provide that when making a

custody determination, the court shall consider "the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest ...."

621, 626 (D.C.1995); *accord, e.g., Fitzgerald v. Fitzgerald,* 566 A.2d 719, 721 (D.C. 1989); *Dorsett v. Dorsett,* 281 A.2d 290, 292 (D.C.1971).

■ As required by Super. Ct. Dom. Rel. R. 52(a), the trial court supported its custody determination with detailed findings of fact and conclusions of law. *See, e.g., Utley v. Utley,* 364 A.2d at 1169; D.C.Code § 16–911(a–2)(6)(C). The court based these findings on its own interviews with the children, the psychological assessment conducted by WATS, the home study evaluation by Joyce Bradford, and Ms. Bradford's testimony at the November 15 hearing. In particular, the court found that Mrs. Spires had been the primary caretaker for most of the children's lives [6] and that she never had any intention to abandon them.[7] The court also found that Mrs. Spires had steady employment; that she maintained a stable and appropriate home for the children, attending to their physical, educational, and emotional needs; and that the children were comfortable with Mrs. Spires in the home she had created.[8] The court gave due consideration to the expressed wishes of the children, but found them to be inconclusive and therefore worthy of little weight.[9]

■ The court faulted Mr. Spires for not being "completely candid with the Court regarding his living situation, his relationship with [his alleged mistress], and several other matters," including his sources of income. Noting that Mr. Spires has spoken negatively about Mrs. Spires to the children in an attempt to undermine her, the court said that it considered this factor to be "of great significance in making a custody determination in this case." One of the reasons why we accord such a high level of deference to trial judges in child custody cases is that "in addition to

[her] evaluation of the credibility of witnesses ... only the trial judge has an opportunity to appraise at first hand the character of the parties." *Dorsett v. Dorsett,* 281 A.2d at 292. It was therefore entirely appropriate for this trial judge to base her ruling, at least in part, on an assessment of Mr. Spires' character and its effect on the children's relationship with their mother.

■ Both in his brief and at oral argument, Mr. Spires contends that the trial court erroneously denied him the opportunity to present witnesses relevant to the custody determination. We cannot consider these claims, however, because Mr. Spires has failed to include in the record on appeal a transcript of the proceeding at which the trial court allegedly made these rulings. A party noting an appeal from a judgment of the trial court has an affirmative duty "to present this court with a record sufficient to show affirmatively that error occurred." *Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982) (citations omitted). "[W]e cannot base our review of errors upon statements of counsel [or, in this case, statements of a party] which are unsupported by [the] record." *D.C. Transit System, Inc. v. Milton,* 250 A.2d 549, 550 (D.C. 1969) (cited with approval in *Cobb,* 453 A.2d at 112). Thus we reject Mr. Spires' argument for lack of record support.

The record which we do have shows that "the trial judge has considered all relevant factors and no improper ones, and [that] her decision is ... supported by substantial reasoning drawn from a firm factual foundation in the record." *Prost v. Greene,* 652 A.2d at 626 (citations omitted). The order from which this appeal is taken is therefore

*Affirmed.*

---

6. *See* D.C.Code §§ 16–911(a)(5)(H) and 16–914(a)(3)(I).

7. *See* D.C.Code §§ 16–911(a)(5)(B) and 16–914(a)(3)(B).

8. *See* D.C.Code §§ 16–911(a)(5)(D), (E), (I), (K) and (N), and 16–914(a)(3)(D), (E), (J), and (O).

9. *See* D.C.Code §§ 16–911(a)(5)(A) and 16–914(A).

SCHWELB, Associate Judge, concurring:

I agree that the judgment should be affirmed, and I am pleased to join the opinion of the court. I add this brief concurrence because the contents of the purported agreement of the parties summarized in footnote 2 of the court's opinion and in the associated text are sufficiently remarkable to warrant the reproduction of the document in full. I have therefore appended a copy of the "Marital Agreement" to my separate opinion. I commend the entire agreement to the reader's attention, for the full impact of its depravity is difficult to capture even in the most accurate summary.

Although, unfortunately, some men abuse, oppress and humiliate their wives, it is surely rare for a husband not only to reduce to writing an instrument requiring total subordination by the wife to the husband's caprice, but also to require his unfortunate spouse to sign it. I find it even more remarkable that a husband who has contrived to secure his wife's formal written assent to the husband's assertion of supremacy would then have the temerity to ask a court to enforce such an oppressive document according to its terms.

In my opinion, a "contract" such as the one between these parties, which formalizes and seeks to legitimize absolute male domination and female subordination within the marital relationship, is against the public policy of this jurisdiction. It may not be enforced in our courts, nor can it be permitted to affect adversely the rights of the oppressed wife or her children. To me, the appendix to this opinion is worth preserving as a striking example of the lengths to which some men would go to formalize the absurd and to exalt to contractual status their petty domestic tyranny.

One would hope that the document before us will be regarded by the reader as a curious but deeply offensive relic of a bygone era. It reflects a view of the relationship between the sexes that should have been consigned long ago to well-deserved oblivion. Under the law, the parties' now-defunct marriage made Mrs. Spires her former husband's partner, not his slave.

APPENDIX

MARITAL AGREEMENT

This document drawn on this _____2 3 ʳᵈ_____ day of _Sₑₚₜₑₘᵦₑᵣ_ 1991 with the below affixed signatures of Yvonne Angenette Spires, Myles Spires, Jr. and a notary public, shall henceforth serve as the governing document for the continuance and, if applicable, the dissolution (including distribution of assets and placement of children) of the abovementioned parties' marriage, which began October 27, 1984, as per the husband's, Myles Spires, Jr., discretion.

The husband, Myles Spires, Jr., hereby agrees to continue in this marriage provided that the wife, Yvonne Angenette Spires, complies with the following articles of continuance and any addendums added bearing the notarized signature of the husband.

## ARTICLES OF CONTINUANCE

1. Wife shall in no case obtain money from the joint bank accounts, individual accounts, or house emergency funds without express permission of the husband.

2. Wife shall in no case divulge information of any kind which concerns domestic relationships, i.e., marital difficulties, particulars concerning children, job status(es), and financial information to anyone outside of the marriage without the express permission of the husband. Anyone includes the wife's family, acquaintances, and friends and the husband's family, acquaintances and friends.

3. Wife shall in no wise attempt to influence the status/intensity of the relationships that husband has with other individuals outside of the marriage unless the husband verbally requests input from the wife. Moreover, the wife shall, at all times, treat the husband's family, friends, and acquaintances with the utmost respect.

4. Wife shall immediately divulge to the husband any input concerning the marriage or matters concerning the marriage given by outside parties.

5. In public, wife shall in no wise dispute husband on any matters; rather, shall present herself in full accordance with him at all times. Matters of dispute should be handled in private and with due respect, i.e., no yelling, profanity, or badgering.

6. Wife shall conduct herself in accordance with all scriptures in the Holy Bible applicable to marital relationships germane to wives and in accordance with husband's specific requests. Wife shall consult husband as to the applicability of scriptures.

7. Wife's sexual relationships shall remain spontaneous and solely with the husband.

8. Wife shall carry out requests of the husband in strict accordance, i.e., timeliness, sequence, scheduling, etc.

9. Wife shall govern the affairs of the children at her discretion. However, wife shall always inform the husband of any particular dealings with the children, i.e., disciplining, illness, etc. and any input by the husband concerning the children shall be considered a request; handled according to Article 8 of this document.

10. Wife must receive express permission from the husband before removing or lending property jointly owned and/or valued in excess of $100.00 (individually or jointly owned).

11. Wife shall not receive any loan, and/or a monetary or other gift(s) without first obtaining permission from husband. Should it be impossible to contact husband to obtain such permission, wife may receive the loan or gift(s); however, upon next contact with the husband, wife shall inform the husband of all details concerning the loan and/or gift(s), i.e., giver's name, amount, nature, lender's name. Should the wife find anything of value, it shall be treated as receiving a gift or loan.

12. Wife shall participate and interact in the husband's ministry and business affairs according to the husband's direction only. Moreover, she shall in no wise administer funds, interact with supporters, participants or parishioners, or interface with clients without the express direction of the husband.

13. It is agreed that violation of any of these articles by the wife shall be considered mental cruelty and abandonment of the marriage and a request for legal separation and divorce, and may result in legal separation and divorce proceedings.

## ARTICLES OF DISSOLUTION

Should the wife violate any of the abovementioned articles for continuance, and the legal separation and divorce proceedings are instituted, the following articles of dissolution shall serve as a settlement agreement for the legal separation and divorce.

## ARTICLES OF DISSOLUTION

1. The present dwelling where the husband, wife and children now reside, 333 17th Street, N.E., Washington, D.C., shall become the sole possession of the husband, Myles Spires, Jr., with all furnishings, appliances, lighting fixtures and any other articles desired by the husband, Myles Spires, Jr.

2. The children, Delanta A. Spires, Myles Spires III, Lorenzo J. Spires, and Paul Sequoyah Spires shall be in the custody of the husband, Myles Spires, Jr. Visitation shall be determined by the husband.

3. The automobiles shall be divided equally; the red 1987 Ford Taurus shall be the sole possession of the husband, Myles Spires, Jr., and the blue 1988 Ford Escort shall be the sole possession of the wife, Yvonne Angenette Spires.

4. All monies in individual and joint banking accounts shall be the sole possession of the husband, Myles Spires, Jr.

5. Neither party shall be required to pay one another child support or alimony.

6. All unpaid joint debts shall remain joint debts and shall be divided and paid equally by the husband and wife.

7. All individual debts shall remain individual debts and be paid by the individual in whose name the debt is at the time of legal separation and remain the same upon divorce

_____  9/23/91
Yvonne Angenette Spires          Date

_____  9/23/91
Myles Spires. Jr.                Date

I hereby certify that _Yvonne_ _Spires_ and _Myles_ _Spires_ appeared before me this _23rd_ day of _September_ 1991.

_____  9/22/91
Notary Public                    Date

My commission expires: _____